### 66322. CARPENTER v. THE STATE.

DEEN, Presiding Judge.

In May of 1979 appellant Carpenter was retained as counsel by Michael John Grassi, Jr., and ten co-defendants after they were arrested for possession of more than 14,000 lb. of marijuana with the intention to distribute. The other co-defendants ultimately obtained other counsel, but Carpenter continued to represent Grassi throughout the case. Hirsch Friedman, an attorney who had previously worked with Carpenter and who had also worked from

time to time as an undercover agent for law enforcement agencies, was engaged by the Georgia Bureau of Investigation (GBI) to assist that agency, together with the Atlanta Police Department and the Federal Bureau of Investigation (FBI), on the bribery case that underlies this appeal.

As part of his undercover work Friedman, acting on information, went to a restaurant where appellant Carpenter was to meet persons involved in the marijuana case. Friedman and Carpenter got together at the restaurant (there is a conflict in the testimony as to who initially approached whom) and discussed the marijuana case, particularly that aspect involving the proposed bribery of Asst. District Attorney James Bradley, who at that time was in charge of the prosecution of the case. There ensued a number of meetings and telephone conversations between Friedman and appellant, sometimes with others involved in the case also present. During almost all these meetings and conversations except the first, Friedman wore transmitting and tape-recording equipment which enabled law enforcement personnel to listen to, and make a permanent record of, these discussions, which spanned a three-month period between September and December of 1979. Additionally, one of the meetings was videotaped, and another was observed in person by a high-ranking officer of one of the participating law enforcement agencies. One of the meetings was held at a restaurant table, the top of which the GBI had covered with carbon-backed paper for recording the handwritten notes which, in the interest of secrecy, had become a regular feature of the face-to-face meetings.

The result of all these meetings and telephone conversations was that Bradley, the assistant district attorney, was to be paid $50,000 if Grassi alone were freed, or $100,000 if all the other defendants were also freed. Friedman was to be paid to further the negotiations and to transmit the money from Carpenter to Bradley. It was decided that the best way to achieve the goal of freeing Grassi was for Bradley to lose on Grassi's motion to suppress, with a resultant *nolle prosequi.* An alternative suggestion that Bradley arrange for the case to be dead-docketed was rejected because in that posture prosecution of the case would be subject to revival at any time, whereas a *nolle prosequi* would result in a dismissal. The necessity of making it "look good" was emphasized. Throughout these discussions there were bandied about such names as that of Mike Thevis (a notorious Atlanta crime figure) and various *mafiosi.* At least twice Carpenter threatened Friedman with death "if this is a set-up."

Prior to trial the defense filed a number of motions in addition to the motion to suppress evidence, supra, among them a motion to

inspect the money confiscated in the case; a motion for the production of the original tape recordings; a motion for production of copies of Grassi's statements (if any) and of the Georgia Crime Laboratory's reports; other motions of the Brady-Giglio type; and general and special demurrers. At the hearing on the Brady motion it was ascertained that the state had delivered to defense counsel all appropriate documents and other evidence. During the hearing on the motion to suppress, each witness, including Friedman, was extensively examined regarding Friedman's role in the case. The trial court denied all the defense motions except that for copies of the defendant's statements and the crime laboratory reports.

At trial the state presented the tape recordings of the meetings and telephone conversations. Appellant's tape expert testified that he had not had sufficient time to examine the tapes properly but that in his opinion they had been tampered with. Appellant testified that with one exception the tapes accurately reproduced what was said; that Friedman was paid $10,000 for "assistance" in representing Grassi; and that another Atlanta attorney received $7,500 for trying to arrange a plea bargain. A co-defendant testified that appellant had told him that he had paid Bradley to lose the motion to suppress, but that the bribe had not worked. Bradley, the assistant district attorney, did not testify.

After a Clayton County jury found appellant guilty, he was sentenced to serve six years in prison and to pay court costs amounting to almost $5,000. His motion for a new trial on the general grounds was denied, and on appeal he enumerates twelve errors. The first three enumerations have to do with the court's admitting the tape recordings into evidence and allowing Friedman to interpret them, but refusing to allow appellant's expert witness to examine the originals. Numbers eight through eleven challenge jury instructions on circumstantial evidence, the time of the crime's occurrence, standard of proof, and conspiracy. The enumerations numbered four and six assign as error the trial court's refusing to make an *in camera* inspection of the state's file and "restricting" appellant's cross-examination of Friedman. The fifth assignment of error concerns the court's denial of appellant's motion for a directed verdict of not guilty, and the seventh assigns as error the court's permitting the prosecutor in his closing argument to draw an inference of guilt from the relative seating positions of the defendant and his counsel. Finally, appellant enumerates as error the length of the sentence imposed. *Held:*

1. The trial court did not err in refusing to order the state to turn over the original tape recordings for examination by the appellant's

independent expert. While fairness and due process require that a defendant have reasonable access to any potentially exculpatory evidence, Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), the evidence sought must be "material" and "of substantial probative force," White v. Maggio, 556 F2d 1352 (5th Cir. 1977), and the defendant's right must be balanced against the state's legitimate interest in securing such evidence from alteration, loss, or destruction. *Patterson v. State,* 238 Ga. 204 (232 SE2d 233) (1977). Maggio, supra, decided at about the same time as *Patterson,* supra, set forth a two-pronged test for determining when the withholding of evidence by the prosecution constitutes reversible error. This test applies to tangible evidence and is triggered only when, as in the instant case, the defense has made a specific rather than a general request for potentially exculpatory evidence. The evidence sought must be both "critical" to conviction and subject to varying expert opinion. Id. at 1356.

In *Moore v. State,* 240 Ga. 807 (243 SE2d 1) (1978), the Supreme Court of Georgia confined *Patterson,* supra, to its own facts; that is, to narcotics cases only. In *Sabel v. State,* 248 Ga. 10, 17 (282 SE2d 61) (1981), however, the court, citing Maggio, extended the *Patterson* rationale to non-narcotics cases: "a criminal defendant on trial for his liberty is entitled on motion timely made to have an expert of his choosing, bound by appropriate safeguards imposed by the court, examine critical evidence whose nature is subject to varying expert opinion." Compare Barnard v. Henderson, 514 F2d 744 (5th Cir. 1975).

At first blush the facts in the instant case would seem to fulfill the *Sabel* criteria: The authenticity of the tapes is undoubtedly "subject to expert opinion"; the motion was indisputably timely made; and appellant was undeniably "on trial for his liberty." The Maggio test is stated conjunctively, however — the evidence sought must be *both* critical *and* subject to varying expert opinion. The crux of the matter thus becomes, as the state argues in its brief, whether the original tapes, concededly subject to varying expert opinion, constituted "critical" evidence in the case *sub judice.*

Maggio defines critical evidence, for due process purposes, as "evidence that, when developed by skilled counsel and experts, could induce a reasonable doubt in the minds of enough jurors to avoid a conviction." White v. Maggio, supra at 1357, 1358. In Maggio the badly damaged spent bullets which the defendant sought to have subjected to independent analysis were the *only* tangible evidence connecting him with the murder with which he was charged; the remainder of the evidence against him was very weak, and doubt as to

the bullets' identity could have seriously impaired or even destroyed the state's case.

In the instant case, however, the tapes were but a single strand — albeit a rather bulky one — in the extensive web of evidence constituting the fabric of the prosecution's case. The testimony of the law enforcement officers who observed and/or listened to the radio transmissions of the lengthy negotiations, coupled with that of other witnesses, not only confirms the authenticity of the tapes but builds so powerful a case as to leave little, if any, room for reasonable doubt in the minds of the triers of fact. Moreover, appellant's expert conceded that the copies provided him were of high quality. The chief function of the tapes in the prosecution's case was to bring home to the jurors in a concrete and dramatic way the enormity of the offense with which the defendants were charged, and concerning which the other evidence was so overwhelming. The evidence provided by the tapes (unlike that in Maggio) was thus cumulative in nature rather than critical. This being so, the trial court was not obligated to order the original tapes turned over for analysis by the appellant's independent expert, and appellant's first enumeration is without merit.

2. The court did not err in permitting a party to the taped conversations (Friedman) to give such testimony as would place the individual taped conversations in context as to the occasion, the speakers, and the subject matter. Such testimony laid a proper foundation for admission of the tapes into evidence. *Burke v. State,* 248 Ga. 124, 125 (281 SE2d 607) (1981). See also *State v. Knowles,* 247 Ga. 218 (274 SE2d 468) (1981).

3. Nor did the court err in providing the jurors with printed copies of the transcriptions of the tapes so as to facilitate their following the tapes as they were played in court. The tapes had been properly introduced into evidence, Division 2, supra, and had been authenticated not only by the testimony of Friedman and of law enforcement officers who had listened to FM transmissions of the conversations, but also by appellant himself, who conceded that, except for a handful of isolated spots that he thought might have been altered, the tapes accurately represented the conversations. There was testimony establishing the chain of custody and thereby precluding the likelihood of tampering. The transcriptions themselves had been authenticated by law enforcement officers who had compared the printed transcriptions with the tapes as they were played. See *Burke v. State,* supra; *State v. Knowles,* supra. Both the second and third enumerations are without merit.

4. The trial court was authorized, in the fact situation presented in this case, in refusing appellant's request for an *in camera*

inspection of the prosecution's file.[1] Examination of the trial transcript discloses that the prosecuting attorney stated in his place that (with the exception of the original tapes, which we have held, supra, not subject to a Brady-Giglio motion) all potentially exculpatory material had been provided the defense, either through the FBI's report or through testimony at the hearing on the motion to suppress. Moreover, the prosecutor stated that he was willing for defense counsel to inspect his file; the defense did not accept this offer, however.

We find that appellant misstates the holding of *Tribble v. State,* 248 Ga. 274 (280 SE2d 352) (1981), regarding the conditions mandating an *in camera* inspection; namely, when the prosecution fails to make any response to "a specific and relevant request," supra at 276. *Tribble* defines "response" as consisting of "either . . . furnishing the information or . . . submitting the problem to the trial judge." Id. The prosecution in the instant case complied with the request by responding in the first of these two ways; that is, by providing the appropriate information.

The *Tribble* court went on to caution that "[o]ur holding in this case should not be construed as requiring *reversal* of a conviction solely on account of the trial court's failure to conduct an in camera inspection." Id. *Tribble* cites in support of this admonition *Rini v. State,* 235 Ga. 60 (218 SE2d 811) (1975), in which Georgia's Supreme Court adopted from Moore v. Illinois, 408 U. S. 786 (92 SC 2562, 33 LE2d 706) (1975), three criteria for determining whether an *in camera* inspection is mandatory in a given instance. These criteria are as follows: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Rini v. State,* supra at 63. As we have indicated, supra, the prosecutor did not suppress the evidence requested and offered to let defense counsel inspect his files. We have held in Division 1, supra, that certain evidence sought, namely, the original tapes, was not "material" or "critical" under the Maggio criteria. As to the favorable, or exculpatory, character of the material sought, *Tribble* expressly states, at 275, the court's continued adherence to the rule that " 'a defendant bears the burden of showing prejudice to his case resulting from the prosecution's refusal to turn over documents or evidence.' " *Coachman v. State,* 236 Ga. 473 (224 SE2d 36) (1976).

We agree with the trial judge in this case that the language of the *per curiam Tribble* opinion is not free of all ambiguity. Certain

---

[1] The court notes that the state is incorrect in asserting in its brief that appellant made no request at trial for an *in camera* inspection.

pronouncements are clear-cut, however; i.e., the previously cited statement, at 276, that "the trial court's failure to conduct an in camera inspection," standing alone, does not require a reversal of a conviction; the characterization, id., of prosecutorial response as (in the alternative) "the furnishing of information"; the court's invocation, id., of the Rini-Moore criteria; and the express imposition on the defense of the burden of showing harm. Id. at 275. In the light of these factors, we construe *Tribble* as holding that it is only the prosecution's suppression of Brady-Giglio type material when appropriately requested, or its failure to "respond" in one of the two ways cited, supra, that would trigger the court's duty to make an *in camera* inspection. Such refusal did not occur in the instant case, and the enumeration is therefore without merit.

5. We find no error in the court's overruling the appellant's motion for a directed verdict of acquittal. The evidence was not such as to demand such a verdict. OCGA § 17-9-1 (a) (Code Ann. § 27-1802); *Jones v. State,* 159 Ga. App. 704 (285 SE2d 45) (1981). To the contrary, there was clear evidence establishing that defendant took "a substantial step toward" commission of the offense of bribery. OCGA § 16-4-1 (Code Ann. § 26-1001). Appellant's contention that venue was artificially created is without support in the record.

6. We likewise find no error in the trial court's limiting cross-examination regarding Friedman's personal life. The court properly exercised its discretion in limiting cross-examination both during the suppression hearing and at trial to issues that it deemed material to the case. The "right to a thorough and sifting cross-examination must be tempered and restricted so as not to . . . wander into the realm of irrelevant testimony. Control of the cross-examination of a witness is to a great degree within the discretion of the trial court and will not be controlled unless abused." *Eades v. State,* 232 Ga. 735, 737 (208 SE2d 791) (1974), cited in *Rentz v. State,* 162 Ga. App. 357, 359 (291 SE2d 434) (1982). See also *Mitchell v. State,* 236 Ga. 251 (223 SE2d 650) (1982); *Williams v. State,* 162 Ga. App. 213, 215 (290 SE2d 551) (1982); *Page v. State,* 159 Ga. App. 344 (283 SE2d 310) (1981); *Hart v. State,* 14 Ga. App. 364 (80 SE 909) (1913).

7. The prosecuting attorney's remark regarding the alleged implications of the seating arrangements at the defense counsel table was not reversible error. The comment excepted to was made during the closing argument: "[I]t's just sort of curious to note the position of everybody . . . in this courtroom . . . Where does his [appellant's attorney] client sit? He doesn't sit by him." Defense counsel immediately objected and denied that anything was implied by the

seating arrangement.[2] The court did not rebuke counsel or admonish the jury to disregard the comment.

OCGA § 17-8-75 (Code Ann. § 81-1009) forbids the prosecutor's improperly drawing an inference from facts not in evidence. While we disapprove such comments, the remark assigned as error here "approached but was not outside the parameters of the wide latitude accorded counsel for the state in such cases and did not impermissibly allude to facts which were not in evidence within the meaning of [OCGA § 17-8-75 (Code Ann. § 81-1009)]." *Gregoroff v. State,* 158 Ga. App. 363, 365 (280 SE2d 373) (1981), rev'd on other grounds 248 Ga. 669 (285 SE2d 537) (1982). Moreover, Georgia's courts have held that, in determining whether an uncorrected argument of counsel resulted in a miscarriage of justice, the proper standard is the " 'highly probable test' "; "i.e., that it is 'highly probable that the error did not contribute to the judgment.' Traynor, What Makes Error Harmless, The Riddle of Harmless Error (1970)." *Johnson v. State,* 238 Ga. 59, 61 (230 SE2d 869) (1976). See also *Jones v. State,* supra at 705; *Sanford v. State,* 153 Ga. App. 541, 542 (265 SE2d 868) (1980). The *Jones* court concluded further that, "[t]he evidence . . . in this case is overwhelming . . . Hence, we conclude that it is highly probable that the error did not contribute to the verdict." Id. In like manner, the evidence in the case at bar is so overwhelming that it is highly probable that the remark excepted to worked no prejudice to the defendant and did not contribute to his conviction. *Johnson v. State,* supra; *Showker v. State,* 146 Ga. App. 862, 863 (247 SE2d 515) (1978).

8. Appellant enumerates as error four jury instructions. We find that each of these correctly states applicable law. We shall address each of them separately, however.

Appellant assigns as error the trial court's charge and re-charge on circumstantial evidence, alleging that in the charge as given the court failed to explain "That it is incumbent upon the state to prove the absence of the other reasonable hypotheses other than guilt and to prove that absence beyond a reasonable doubt." Scrutiny of the jury instruction as recorded in the transcript of the proceedings below convinces us that this enumeration is without merit. The court charged as follows: "Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may infer other related or connected facts which are reasonable and justified in the light of your experience. Circumstantial evidence alone will not

---

[2] The court notes that, according to the record, the state is incorrect in its assertion in its brief that defense counsel did not object to this remark at trial.

justify a finding of guilty unless the circumstances are entirely consistent with the defendant's guilt, wholly inconsistent with any reasonable theory of the defendant's innocence, and are so convincing as to exclude a reasonable doubt of the defendant's guilt." This instruction is entirely consistent with OCGA § 24-4-6 (Code Ann. § 38-109): "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." We find no error.

9. Appellant next alleges that the court erred in instructing the jurors that a verdict of guilty would be authorized if they found beyond a reasonable doubt that the defendants committed the offense of bribery at any time within four years immediately preceding the filing of the indictment. It is well settled in Georgia law that "evidence of guilt is not restricted to the day mentioned in the indictment, but may extend to any day previous to the finding of the bill and within the statute of limitation for the prosecution of the offense." *Robinson v. State,* 209 Ga. 650 (75 SE2d 9) (1953), cited in *Carmichael v. State,* 228 Ga. 834, 837 (188 SE2d 495) (1972). See OCGA § 17-3-1 (Code Ann. § 26-502); *Reynolds v. State,* 147 Ga. App. 488 (249 SE2d 305) (1978); *Jefferson v. State,* 136 Ga. App. 63 (220 SE2d 71) (1975); *Drummond v. State,* 87 Ga. App. 105 (73 SE2d 43) (1952); *Love v. State,* 70 Ga. App. 40 (27 SE2d 337) (1943). This enumeration is without merit.

10. Appellant assigns as error the court's instruction that the existence of two equal theories, guilt or innocence, requires acquittal. Appellant had requested that the court give an instruction identical with that actually given, except that the word "equal" did not appear in the version requested.

Appellant's argument regarding the "two theories" jury instruction is circular and self-proving and asks this court to ignore the nature of the evidence presented and the law applicable to such evidence. The instruction requested by appellant is correct only when the evidence relied on by the state is wholly circumstantial. OCGA § 24-4-6 (Code Ann. § 38-109); *Bearden v. State,* 163 Ga. App. 434 (294 SE2d 667) (1982); *Griffis v. State,* 163 Ga. App. 491 (295 SE2d 197) (1982); *Nolen v. State,* 124 Ga. App. 593 (184 SE2d 674) (1971). Compare *Kreager v. State,* 148 Ga. App. 548 (252 SE2d 1) (1978), cited by appellant, in which the evidence was wholly circumstantial.

In the instant case, as in *Bearden* and *Griffis,* supra, direct evidence was presented by the state, and the "two theories" instruction therefore is inappropriate. Moreover, in the instant case, as was also true in *Bearden* and *Griffis,* "the evidence as to the two theories, guilt or innocence, . . . was not of such equality that the

theory of innocence had to be accepted." *Bearden,* supra at 434. "Whether dependent upon direct or circumstantial evidence, the true question in criminal cases is not whether it is possible that the conclusion at which the evidence points may be false, but whether there is sufficient evidence to satisfy the mind and conscience beyond a reasonable doubt." OCGA § 24-4-5 (Code Ann. § 38-110); *Dunson v. State,* 202 Ga. 515 (43 SE2d 504) (1947). The record discloses that the jury instruction given in the case *sub judice* met the statutory criteria and that the state's burden of proof was in no way lightened thereby. The record further discloses that the court gave correct and adequate instructions regarding presumption of innocence, quantum of evidence, burden of proof, and other theories relevant to the facts of this case. When a jury charge is enumerated as error, the court must look to it as a whole in order to determine its fairness and accuracy. *State v. McNeill,* 234 Ga. 696 (217 SE2d 281 ) (1975). The charge as requested was unauthorized in this case; the charge as given correctly stated the relevant law. This enumeration is without merit.

11. Appellant asserts that the trial court erred in giving the jury an instruction on conspiracy when the offense charged was not conspiracy but attempted bribery. "It has been repeatedly held by this court that a conspiracy may be proved, though not alleged in the indictment or accusation. *Dixon v. State,* 116 Ga. 186 (8) (42 SE 357)." *Bruster v. State,* 228 Ga. 651, 652 (187 SE2d 297) (1972); *Knowles v. State,* 159 Ga. App. 239 (283 SE2d 51) (1981). The court acted properly in instructing the jury regarding conspiracy.

Appellant further contends, however, that absent an express instruction by the court that a conspiracy must include persons other than a defendant and an undercover agent, the jury might be confused and think that the transactions between appellant and Friedman constituted a conspiracy in the contemplation of the law. The record discloses no request for a particular instruction on conspiracy. Moreover, there repeatedly occurs in the instruction, as revealed in the transcript, the word "defendants" (note plural); and at one point the court states, "I charge you that the prosecution has the burden of proving beyond a reasonable doubt that the defendants in this case came to a mutual understanding for the purpose of accomplishing the alleged attempted bribery." OCGA § 17-7-54 (Code Ann. § 27-701) deems correct "[e]very indictment . . . which states the offense in the terms and language of this Code, or so plainly that the nature of the offense charged may easily be understood by the jury . . ." We do not agree that an ordinary reasonable juror who had read the indictment and had been attentive to the evidence would have any difficulty in understanding that any conspiracy that might be found would necessarily involve other persons in addition to

Carpenter and Friedman. This enumeration is without merit.

12. We commend appellant for his ingenuity if not his candor in attempting to reduce the range of permissible sentences by arguing that there was a "possibility" or even a "real probability" that the court's instruction on conspiracy induced the jury to convict appellant of conspiracy (maximum sentence: 5 years) rather than of attempted bribery (a 10-year maximum). We decline to join in this semantic legerdemain, however. Even had we held in Division 11, supra, that there was some flaw in the court's instruction to the jury regarding conspiracy, the offense charged in the indictment would not thereby have been transubstantiated from attempted bribery into conspiracy. Since we have found that the instruction as given was free of confusion or other error, it follows that we find no merit in appellant's twelfth enumeration. See OCGA §§ 16-4-1 (Code Ann. § 26-1001), 16-4-6 (Code Ann. § 26-1006), 16-4-8 (Code Ann. § 26-3201). As to appellant's contention that the $4,702.90 which he was ordered to pay was a fine which exceeded the statutorily permissible amount, it is clear from the record that this sum represents court costs rather than a fine. OCGA § 17-11-1 (Code Ann. § 27-2801) authorizes the trial court to assess costs against a convicted criminal defendant. The sentence imposed did not exceed that allowed by law.

*Judgment affirmed. Banke and Carley, JJ., concur.*

DECIDED JULY 1, 1983 —
REHEARING DENIED JULY 28, 1983 — 

*J. Dunham McAllister, Bobby Lee Cook,* for appellant.
*Robert E. Keller, District Attorney, Clifford A. Sticher, Assistant District Attorney,* for appellee.