## 67798. GRAHAM v. THE STATE.
## 67808. WOOD v. THE STATE.
## 67809. JORDAN v. THE STATE.

BENHAM, Judge.

A jury found appellants guilty of two counts of kidnapping, two counts of aggravated assault upon a peace officer, aggravated assault, and attempted armed robbery. We have consolidated the three appeals from the judgments entered on the jury's verdicts.

1. Appellants Wood and Jordan assert the general grounds, claiming that the evidence presented at trial was not sufficient to support the verdicts rendered against them. After reading the trial transcript, we must disagree with appellants' contentions. The State presented evidence which showed that the three appellants and a co-indictee (Droxler), who testified for the State, escaped from a county jail in Alabama by using a homemade key which appellant Jordan had. The four escapees drove to the home of Graham's parents where Graham got a shotgun and ammunition. The four abandoned the sheriff's car they had driven to the Graham home and took an automobile belonging to Graham's sister. They then proceeded to Georgia where they came upon George Horsley, who was in a field placing fencing around the bases of his apple trees. While Graham brandished the shotgun, the escapees took Horsley's car and forced him to accompany them. They relieved Horsley of the nearly $300 in cash he had in his wallet and purchased food, beer, and gasoline for Horsley's dark-colored station wagon.

While driving down Highway 41 in Cobb County, the quintet spotted Randall McInnis, who was hitchhiking. Concluding that McInnis might have money because he was dressed in a suit and carrying a briefcase, the group stopped and picked him up. As soon as McInnis was seated in the right rear seat of the station wagon, Jordan asked him for money and then slapped him across the face with a force that knocked McInnis' glasses off. Jordan then pointed the shotgun at McInnis and demanded his money, threatening to shoot the victim if he refused. When the car stopped at a traffic signal, McInnis attempted to flee from the vehicle but was physically restrained from leaving by Jordan, Wood, and Droxler. McInnis managed to break free and escape from the car, which was then driven away.

Officer McClure, a patrolman for the Marietta Police Department, observed a passenger in the station wagon being held by his hair and beaten. After he saw the victim exit the car, the officer put on his siren and blue light and pursued the station wagon. When he saw the shotgun passed from the front passenger seat to the back seat and pointed at him, the officer radioed for assistance, and a high speed chase involving a number of police cars ensued. Officer McClure

heard five or six shots fired from the station wagon and heard pellets hit the side of his car, one pellet hitting the officer in the arm.

Officer Harper, another Marietta patrolman, was also involved in the pursuit of the station wagon. When a hastily set up roadblock impeded McClure, Harper's car, with siren wailing and blue light flashing, became the lead chase vehicle. When Harper saw the passenger in the right front seat shoot at him, he sought and was given permission to return the fire. The gun was passed to the back of the station wagon where another passenger continued to fire at the officer. When the station wagon turned off the paved street onto a dirt road, Harper was hit in the face, arms, forearms, shoulders, and chest with a shotgun blast of bird shot. Droxler's testimony put Wood in the place from which the officer said the wounding shot came. The four men abandoned the station wagon and fled into the sparsely populated, swampy, wooded area. Three hundred law enforcement personnel, bloodhounds, and helicopters took part in the manhunt which followed. Droxler gave himself up and appellants were tracked down by a bloodhound the next morning. The shotgun was recovered from three to four feet of water some days later by means of a magnet during a search of the area by Cobb County law enforcement officers.

The State presented evidence which showed that appellant Jordan had physically restrained McInnis when he attempted to flee from the station wagon; that Jordan had slapped McInnis and demanded his money; that Jordan had pointed the shotgun at McInnis and demanded money; and that Jordan had fired the shot that hit Officer McClure. This evidence was sufficient for a rational trier of fact to find appellant Jordan guilty beyond a reasonable doubt of kidnapping McInnis (OCGA § 16-5-40 (a); *Peavy v. State,* 159 Ga. App. 280 (1b) (283 SE2d 346) (1981)); aggravated assault of McInnis (OCGA § 16-5-21 (a) (1)); attempted armed robbery (OCGA §§ 16-4-1; 16-8-41 (a)); and aggravated assault of Officer McClure (OCGA § 16-5-21 (c)). Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

The evidence adduced at trial also showed that appellant Wood held what the victim thought was a knife to Mr. Horsley's side to prevent him from leaving the car; that he aided in restraining McInnis from fleeing; and that he fired the shot that wounded Harper. This was sufficient evidence for a rational trier of fact to find appellant Wood guilty of the kidnappings of Horsley and McInnis (OCGA § 16-5-40 (a); *Peavy v. State,* supra); and the aggravated assault of Officer Harper (OCGA § 16-5-21 (c)). Jackson v. Virginia, supra.

This is not to say that there was no evidence to support Jordan's convictions for the kidnapping of Horsley and the aggravated assault of Officer Harper; and Wood's convictions for the aggravated assault and attempted armed robbery of McInnis, and the aggravated assault

of Officer McClure. The State also traveled under the theory that appellants entered into an unlawful conspiracy to flee confinement and posited that all of the acts alleged in the indictment were committed in furtherance of the conspiracy. If individuals associate themselves in an unlawful enterprise, any act done in pursuance of the conspiracy by one or more of the conspirators is, in legal contemplation, the act of all. *Evans v. State*, 167 Ga. App. 396 (1) (306 SE2d 691) (1983). If the State successfully proved the existence of the conspiracy, then there was sufficient evidence to establish the guilt of all three appellants of all the crimes charged.

"The question of the existence of a conspiracy is for the jury to decide. [Cit.] And the existence of a common design or purpose between alleged conspirators may be shown either by direct or circumstantial evidence. [Cit.] Thus, conspiracy may be shown by conduct as well as by direct proof or express agreement, by inference as well as deduction from conduct which shows common design on the part of persons charged to act together for the accomplishment of the unlawful purpose. [Cits.]" *Wireman v. State*, 163 Ga. App. 439 (2) (295 SE2d 530) (1982). We conclude that the evidence summarized above was sufficient to show that appellants acted in concert with each other in an effort to effect an unlawful escape. *Ford v. State*, 163 Ga. App. 745, 746 (296 SE2d 85) (1982). Thus, the evidence was sufficient for a rational trier of fact to conclude that each appellant was guilty beyond a reasonable doubt of all the crimes alleged in the indictment. Jackson v. Virginia, supra; OCGA § 16-2-20.

2. All three appellants take issue with the denial of their motions to sever. "When indicted for a capital felony when the death penalty is waived, or for a felony less than capital, or for a misdemeanor, such defendants may be tried jointly or separately in the discretion of the trial court." OCGA § 17-8-4. A motion for severance "is committed to the sound discretion of the trial judge, whose ruling is subject to reversal only for an abuse of discretion. [Cit.]" *Ellis v. State*, 164 Ga. App. 366 (6) (296 SE2d 726) (1982). "The trial judge's denial of the motion to sever will not be disturbed unless the defendant can make a clear showing of prejudice. [Cit.]" *Mulkey v. State*, 250 Ga. 444 (1) (298 SE2d 487) (1983).

"Some of the considerations for the court in exercising its discretion have emerged from the cases considering motions to sever: 1. Will the number of defendants create confusion of the evidence and law applicable to each individual defendant? 2. Is there a danger that evidence admissible against one defendant will be considered against another despite the admonitory precaution of the court? 3. Are the defenses of the defendants antagonistic to each other or to each other's rights? [Cit.] If the defendant can show the court by some facts that failure to sever will prejudice him under one or more of

these considerations, his motion should probably be granted." *Cain v. State*, 235 Ga. 128, 129 (218 SE2d 856) (1975).

Appellants Jordan and Wood each raises the spectre that evidence admissible against one of his co-defendants was used against him to convict him of the crimes in which he was not an active participant. As noted in Division 1, much, if not all, of the evidence admitted against each defendant was admissible against his co-defendants since the State prosecuted the case on a conspiracy theory. See *Robinson v. State*, 164 Ga. App. 652 (4) (297 SE2d 751) (1982).

Appellant Graham posits that separate trials might have resulted in a different outcome. However, " '[t]he burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal.' [Cits.]" *Armour v. State*, 151 Ga. App. 254 (1) (259 SE2d 662) (1979). Graham also believes that the joint trial caused juror confusion, but he has not supported that theory with any citations to the record and our own review of the record discloses no hint of juror confusion.

Graham also contends that the joint trial prejudiced him by making his co-defendants unavailable to testify. "In order to have his motion for severance granted, however, the defendant must show not only that his co-defendant will probably not testify at trial where he could cross-examine him or elicit the testimony desired, but also that the testimony of the co-defendant would tend to exculpate the defendant." *Cain v. State*, supra, p. 130. No such showing was made. Therefore, the trial court did not abuse its discretion in denying the motion to sever. *Myrick v. State*, 155 Ga. App. 496 (1) (271 SE2d 637) (1980).

Graham also argues that the joint trial prevented him from testifying in his own behalf. However, the record reflects that Graham made a knowing and intelligent exercise of his constitutional right not to testify.

Each of the three appellants contends that his defense was antagonistic to those of his co-defendants. "The mere fact that co-defendants' defenses are antagonistic is not sufficient in itself to warrant separate trials. [Cit.]" *Cain v. State*, supra, p. 129. No clear showing of prejudice having been made, it was not error to deny the motions to sever.

3. The trial court also denied each defendant's motion to suppress and motion in limine, all of which were concerned with the shotgun used in the attempted armed robbery of McInnis and in the aggravated assaults of the two police officers.

When appellants abandoned the station wagon and fled into the wooded, swampy area, they took the shotgun belonging to Graham's father with them. However, none of them had it in his possession when captured. At the hearing on the motions to suppress, the State

presented evidence that Graham, after being given his Miranda warnings, told a police officer that the gun had been thrown in the swamp near the place of capture. The Cobb County sheriff had this information and, after hearing that Graham had voiced some concern for the shotgun, talked with Graham about assisting in the search for the gun. The sheriff testified that some days later, Graham said that he had spoken with his attorney and with his parents and agreed to help find the gun so that it could be returned to his father. He went with law enforcement officers to the area where appellants were captured and pointed out several places where he believed the gun to be. However, none proved correct, and the weapon was found by a wading police officer armed with a magnet. The attorney representing Graham at that time stated at the suppression hearing that he had told Graham not to talk with law enforcement officers and that he could not recall receiving any phone call from Graham. In their motions to suppress, the defendants claimed that the gun had been found in violation of their Fourth and Sixth Amendment rights. The trial court concluded that the defendants had abandoned the gun; that Wood and Jordan had no standing; and that Graham had freely and voluntarily waived his right to have counsel present during the sheriff's questioning, and had consented to aid in the search for the gun.

To support their contention that they have standing to complain about the search of the swamp and the seizure of the gun, appellants Wood and Jordan rely on *Cook v. State*, 134 Ga. App. 712 (215 SE2d 728) (1975); and *Wood v. State*, 224 Ga. 121 (160 SE2d 368) (1968), both of which rely on Jones v. United States, 362 U. S. 257 (80 SC 725, 4 LE2d 697) (1960), and the rule of "automatic standing," applicable to defendants charged with crimes of possession. No such charge was made against any of these appellants. Furthermore, the U. S. Supreme Court overruled Jones in United States v. Salvucci, 448 U. S. 83 (100 SC 2547, 65 LE2d 619) (1980), and held that "an illegal search only violates the rights of those who have 'a legitimate expectation of privacy in the invaded place.' [Cit.]" United States v. Salvucci, supra, 448 U. S. 91-92. Since neither Jordan nor Wood established that he had a possessory interest in the gun itself or a legitimate expectation of privacy in the swamp, neither had standing to voice a Fourth Amendment objection to the search of the swamp or the seizure of the shotgun. "[A]n individual who claims he is aggrieved by an illegal search and seizure only through the introduction of evidence secured by a search of a third person's premises has not had any of his Fourth Amendment rights infringed." *Staton v. State*, 164 Ga. App. 464 (1) (297 SE2d 375) (1982). Nor could Jordan and Wood raise a Sixth Amendment argument that Graham was deprived of his right to counsel since the rights guaranteed by the Sixth Amendment are personal. See *Stevens v. State*, 247 Ga. 698 (7) (278

SE2d 398) (1981).

Appellant Graham also is without standing to challenge the search of the swamp and the seizure of the shotgun. Like Jordan and Wood, he had no legitimate expectation of privacy in the swamp and since he abandoned the shotgun in the swamp, he has no standing to challenge its seizure. *Nelson v. State*, 160 Ga. App. 168, 170 (286 SE2d 504) (1981).

Graham argues that he did not make a valid waiver of his right to have counsel present during the search for the gun or to consult with his attorney prior to the search. At the suppression hearing, the sheriff stated that he urged Graham to consult his attorney and that appellant replied that he had done so and was willing to aid in the search. There was no evidence that appellant was physically or mentally disabled due to drug or alcohol influence. As appellant points out, " '[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' Johnson v. Zerbst, [304 U. S. 458 (58 SC 1019, 82 LE 1461) (1937)]. It is also clear from Johnson v. Zerbst that the trial judge has the responsibility of determining whether the accused has intelligently waived his right to counsel." *Clarke v. Zant*, 247 Ga. 194, 196 (275 SE2d 49) (1981). The trial court made its determination, and we find no error in its finding. We conclude that no error occurred when the trial court denied appellants' motions to suppress.

4. All appellants maintain that the trial court erroneously failed to dismiss a juror for cause. The juror in question, Kathy Lloyd, was seated as the first of two alternate jurors after appellants had exhausted their peremptory challenges.

Ms. Lloyd stood up when the trial court, propounding the statutory voir dire questions found at OCGA § 15-12-164 (a), inquired whether any juror had any bias or prejudice for or against the defendants. She informed the court that she was a volunteer probation officer who, coincidentally, had been in the police station during the police chase and had overheard the police radio transmissions. She had also read several newspaper accounts of the incidents which formed the bases for the indictments. Further inquiry revealed that she had not formed or expressed an opinion for or against the defendants; that she felt no partiality to the State or the defendants; and that she subscribed to the belief that the State had to prove its case while the defendants had to prove nothing. In response to questioning by the court, Ms. Lloyd stated that she could listen to the admitted testimony and follow the court's legal instructions, apply that law to the facts presented, and not be swayed by anything she previously

knew about the case. She concluded that she could act fairly and impartially.

"The conduct of the voir dire and whether to strike a juror for cause, are within the discretion of the trial court, and the court's rulings are proper absent some manifest abuse of discretion. [Cit.] . . . This prospective juror testified that she had no opinion on the defendant['s'] guilt or innocence, that if selected as a juror, she could listen to all of the evidence and arrive at a verdict based on that evidence applied to the law as charged by the court, regardless of any talk which she had heard, and that she would not let anything she had previously heard or read sway her. There was no abuse of discretion in failing to strike this juror for cause." *Taylor v. State*, 243 Ga. 222 (2, 3) (253 SE2d 191) (1979). See also *Foster v. State*, 248 Ga. 409 (3) (283 SE2d 873) (1981).

Appellant Graham contends that Ms. Lloyd's position as a volunteer probation officer was reason enough to strike her for cause under OCGA § 15-12-1. The statute, as it was in effect at the time of jury selection in appellants' trial, exempted full-time law enforcement officers from jury duty, and specifically denied the exemption to part-time or honorary peace officers. Thus, Ms. Lloyd was not statutorily exempt from serving on the jury. Appellant Graham contends that this court's holding in *Corvair Furniture Mfg. Co. v. Bull*, 125 Ga. App. 141 (6) (186 SE2d 559) (1971), requires that Ms. Lloyd be stricken for cause. In *Corvair*, this court held that a juror's failure to disclose his positions as a part-time policeman and honorary deputy sheriff was not reversible error. The court noted that while the juror may have been *exempt* from service, he was not *disqualified*. While this holding appears to fly in the face of OCGA § 15-12-1, it has no effect on the case at bar since Ms. Lloyd chose to serve on the jury, thereby waiving any exemption she might have had.

5. Ms. Lloyd was called from her position as alternate juror to replace a juror who was excused by the trial court due to illness. After being told that a juror had bumped her head, the trial court noticed that the juror "seemed to be distressed." The trial continued after a short recess was taken in order for the juror to compose herself. After the luncheon break, the juror reported that she felt fine; however, later that afternoon the trial court announced that the bailiff had reported the injured juror to be "quite ill" and seeking to be excused. After a side bar conference, the trial court excused the ill juror and replaced her with Ms. Lloyd. Appellants argue that the trial court's actions were erroneous and should only have followed a hearing on the severity of the stricken juror's illness.

"If at any time, whether before or after final submission of the case to the jury, a juror dies, or becomes ill . . . the first alternate juror shall take the place of the first juror becoming incapacitated

. . ." OCGA § 15-12-172. The excusal of a juror and the substitution of the alternate juror are matters "necessarily within the discretion of the trial court and no abuse of discretion has been shown. The substitution of the alternate juror was proper. [Cits.]" *Green v. State*, 246 Ga. 598 (16) (272 SE2d 475) (1980).

6. Appellants maintain that they have been denied their right to appeal because the contents of a tape played during the trial were not transcribed. Appellants argue that the failure to transcribe the tape has rendered the transcript incomplete and violates that trial court's order for complete recordation and transcription of the proceedings. After the trial, the court reporter informed the court that she had been unable to take down and transcribe those portions of the tape which were played.

The tape in issue is the Marietta Police Department's recordation of the radio transmissions made by its various personnel during the pursuit of appellants. A proper foundation for a relevant sound recording was laid prior to the playing of the tape before the jury. See *Steve M. Solomon, Inc. v. Edgar*, 92 Ga. App. 207 (88 SE2d 167) (1955). See also *Harris v. State*, 237 Ga. 718 (5) (230 SE2d 1) (1976). Portions of the tape were then played during the testimony of Officers McClure and Harper, the men who led the chase of appellants.

"The record and transcript of the case, which includes the reel of tape as an exhibit thereto, have been examined by this court. [Appellants'] claim of an incomplete record is without merit. [Cit.]" *Ellis v. State*, supra at 373, Division 16. Furthermore, during their testimony, the officers identified their recorded voices and explained the contents of the played portions, including the police jargon used. The tape served to aurally illustrate each officer's testimony concerning the pursuit of appellants and their victims. "The evidence provided by the [tape] . . . was thus cumulative in nature rather than critical." *Carpenter v. State*, 167 Ga. App. 634, 638 (307 SE2d 19) (1983). That being so, the lack of a transcript of the portions of the tape played before the jury is not reversible error. See *Owens v. State*, 248 Ga. 629, 631-632 (284 SE2d 408) (1981). Compare *Wilson v. State*, 246 Ga. 672, 676 (273 SE2d 9) (1980).

Graham contends that the failure to transcribe the portions of the tape also denied him Fifth and Sixth Amendment rights guaranteed by the United States Constitution. He does not explain how he was so deprived, and we have been unable to discern such a deprivation. The enumerated error is therefore deemed abandoned. Court of Appeals Rule 15 (c) (2); *Wilkie v. State*, 153 Ga. App. 609 (1) (266 SE2d 289) (1980).

7. All three appellants contend that their convictions should be reversed because they were allegedly denied their Fifth and Sixth Amendment rights due to the court reporter's failure to file the trial

transcripts in a timely manner. While appellants were convicted on February 3, 1982, the trial transcript was not completed until late January 1983.

The questions presented by appellants appear to be of first impression in this state. However, courts of other jurisdictions have recognized that a defendant may be denied due process of law where there is an inordinate delay in the appellate process, including an excessive delay in the furnishing of a trial transcript necessary for completion of an appellate record. See United States v. Pratt, 645 F2d 89 (1st Cir. 1981); Rheuark v. Shaw, 628 F2d 297 (5th Cir. 1980); State v. Chapple, 135 Ariz. 281 (660 P2d 1208) (1983); Commonwealth v. Fay, 14 Mass. App. 371 (439 NE2d 855) (1982); State v. Crabtree, 625 SW2d 670 (Mo. App. 1981).

In analyzing the same question presented here, the Fifth Circuit, in Rheuark, adopted an approach which we now endorse: the similarity of a defendant's interests in a speedy trial and a speedy appeal are such that the balancing test adopted for speedy trial violations in Barker v. Wingo, 407 U. S. 514 (92 SC 2182, 33 LE2d 101) (1972), should be applied to situations in which a defendant claims that a delay in the appellate process is violative of due process of law.

The four facts enunciated in Barker v. Wingo, supra at 530 are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." We now undertake an analysis of the facts in appellants' case in light of those four factors.

(1) Although a one-year delay in the appellate process is lengthy, "[t]he mere passage of time is not enough, without more, to constitute a denial of due process." Hughes v. State, 228 Ga. 593 (1a) (187 SE2d 135) (1972). (2) While no reason for the delay was actually asserted by any party, apparently it was the result of the length of the trial proceedings, coupled with the court reporter's relocation to another state. Thus, neither appellants nor the State can be blamed. (3) At the hearing on the motion for new trial, counsel for the appellants admitted that none of them ever notified the trial court that they believed that the transcript preparation was taking an inordinate amount of time. Graham, who had filed a pro se petition for habeas corpus relief in federal court in which he complained of the transcript delay, argued that the filing of his lawsuit was a sufficient assertion of his right to put the trial court on notice of the delay. However, there is nothing in the record which tends to show that the trial court was ever made aware of appellant Graham's suit or his allegations. (4) Finally, we turn to the question of any prejudice appellants may have suffered due to the delay. Unless it clearly appears that the delay in filing the transcript prevented the presentation of an adequate appeal or impaired a defense which would otherwise be available to an appellant

where a new trial is ordered due to trial error, an appellant has not suffered the prejudice which turns a transcript delay into a violation of due process of law. Appellants do not assert any prejudice other than the fact that they were incarcerated, and we refuse to hold that post-conviction incarceration, in and of itself, is a violation of due process of law. Since appellants did not make the requisite showing, the delay in filing the transcript is not adequate grounds on which a new trial should be granted.

8. Appellants Wood and Jordan seek reversal of their convictions on the ground that the trial court erroneously denied their motions for a change in venue which were based upon extensive pre-trial media coverage.

" 'The law in Georgia is well established, and a myriad of cases so hold, that a motion for a change of venue addresses itself to the sound discretion of the trial judge, and that discretion will not be disturbed on appeal unless it can be shown that there was an abuse of this discretion.' [Cit.]" *Quick v. State*, 166 Ga. App. 492 (9) (304 SE2d 916) (1983). "The test as to whether newspaper publicity has so prejudiced a case that an accused cannot receive a fair trial is whether the jurors summoned to try the case have formed fixed opinions as to guilt or innocence of the accused from reading such newspaper articles. [Cit.]" *Graves v. State*, 167 Ga. App. 246 (2) (305 SE2d 913) (1983). Each juror not removed for prejudice indicated that he or she could lay aside any opinion already formed and render a verdict based solely on the evidence presented and the law given by the trial court. "[The] low percentage of venirepersons excused for prejudice [four out of 63, or approximately 6%] strongly corroborates the expressions of impartiality by the other jurors who were not excused for prejudice. [Cits.]" *Berryhill v. State*, 249 Ga. 442, 444 (291 SE2d 685) (1982).

Although appellants claim that Kathy Lloyd was allowed to sit on the jury despite having announced that she had developed a fixed opinion regarding the guilt or innocence of the accuseds, this contention was laid to rest in Division 4 of this opinion. Appellants having failed to produce evidence that the members of the jury had fixed opinions as to appellants' guilt based upon the media coverage, there was no error in denying the motions for a change in venue. *Graves v. State*, supra; *Heard v. State*, 141 Ga. App. 666 (234 SE2d 83) (1977).

9. Wood and Jordan also take exception to a pre-evidentiary charge given by the trial court to the jury. They contend that the charge instructed the jury to violate its statutory oath. Although appellants voiced no objection to the charge at trial (see *Scott v. State*, 250 Ga. 195 (1c) (297 SE2d 18) (1982)), we will address the enumerated error.

After reminding the jury that it was the sole judge of the facts,

the trial court stated: "It is especially important that you perform your duty of determining the facts diligently and conscientiously, for ordinarily there is means of correcting an erroneous determination of facts by the jury." The instruction given was inadequate in that the word "no" was omitted from the phrase "there is no means of correcting . . ."

"The general rule is that, 'A mere verbal inaccuracy in a charge, which results from a palpable "slip of the tongue," and clearly could not have misled or confused the jury' is not reversible error. [Cit.]" *Gober v. State*, 247 Ga. 652 (3) (278 SE2d 386) (1981). Even if we assume that the inaccuracy is not a transcription error, our review of the entire charge convinces us that the verbal inaccuracy could not have confused or misled the jury. See *Buchanan v. State*, 168 Ga. App. 365 (4) (308 SE2d 860) (1983).

10. Wood and Jordan filed motions to compel disclosure under Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). From the transcript of the hearing on the motion, we can discern that appellants sought an in camera review of the State's file after the State had professed compliance with the Brady motion. The court did not conduct a pre-trial inspection, but did conduct a post-trial inspection while entertaining appellants' motions for new trial, and found no exculpatory material in the State's file.

"We hold that a trial court is not required to conduct an in camera inspection of the state's file in connection with a 'general' Brady motion unless, after the state has made its response to the motion, the defense makes a request for such an inspection. [Cits.] . . . Our holding in this case should not be construed as requiring *reversal* of a conviction solely on account of the trial court's failure to conduct an in camera inspection. Assuming material information has not been wrongfully withheld, 'this error . . . (generally) could be cured by post-trial examination . . .' [Cit.]" *Tribble v. State*, 248 Ga. 274 (1, 3) (280 SE2d 352) (1981). Since the trial court's post-trial inspection of the state's file revealed nothing arguably favorable to appellants, appellants were not harmed by the initial failure to make the in camera inspection. *Hill v. State*, 250 Ga. 164 (2) (295 SE2d 838) (1982).

Appellants also contend that the trial court had the duty to copy and seal the State's file in order to preserve it for appellate review. "The Supreme Court and this court have held that only materials which have been *examined* by the trial court need to be sealed, preserved, and copied for review on appeal. [Cits.]" *Steele v. State*, 166 Ga. App. 24 (6) (303 SE2d 462) (1983). Since the trial court did not conduct a pre-trial in camera inspection and appellants did not request that the district attorney's file be copied, sealed, and preserved for appellate review, there was no error in the trial court's failure to do so.

11. Both Wood and Jordan contest the denial of their motions to suppress the identification testimony of victim Horsley on the ground that it was tainted because the photographic lineup displayed to the victim was impermissibly suggestive. Jordan maintains that the identification testimony of victim McInnis should also be suppressed for the same reason. Both appellants argue that the photo lineups were suggestive because the pictures varied in size and texture and the witnesses gave only vague descriptions of appellants.

Our review of the transcript of the hearing on the issue reveals that a display of ten photographs, including one of each of the appellants, was shown to each witness prior to appellants' apprehension. McInnis identified the photo of Jordan as the front seat passenger wielding the shotgun and that of Graham as the driver. Horsley picked out appellants' photographs and identified them as his assailants.

"A pre-trial identification procedure may be so tainted as to require exclusion of an in-court identification, if, under all the circumstances, the procedure was both impermissibly suggestive and it resulted in a substantial likelihood of irreparable misidentification. [Cits.]" *Arnold v. State*, 166 Ga. App. 313 (4) (304 SE2d 118) (1983). "The first inquiry is whether the photographic display was impermissibly suggestive. Only if it was, need the court consider the second question: whether there was a very substantial likelihood of irreparable misidentification." *Payne v. State*, 233 Ga. 294, 299 (210 SE2d 775) (1974). The variance in size and texture in the pictures used does not render the procedure impermissibly suggestive. *Cheeves v. State*, 157 Ga. App. 566 (1) (278 SE2d 148) (1981). See also *Glass v. State*, 158 Ga. App. 475 (280 SE2d 883) (1981). Thus, the in-court identification testimony of Horsley and McInnis was properly admitted.

12. Jordan also takes issue with the trial court's denial of his motion to be excused from the courtroom during the hearing on the motion to suppress the identification testimony of McInnis.

"In Georgia, a criminal defendant is constitutionally guaranteed the right to be present at all stages of his trial. [Cits.] As with any constitutional right, this one may be waived by the defendant. [Cit.] However, that is not to say that a defendant has an absolute right to waive his right to be present at trial. [Cit.] . . . [A] criminal defendant's right to be present at his trial does not include a concomitant right of absence. [Cits.] Where identification of the defendant by a witness is contemplated by the prosecution, the state is entitled to demand the presence of the defendant. [Cits.] It was not error for the trial court to refuse to honor appellant's request to leave the courtroom, since . . . the trial court is empowered to order a criminal defendant's personal appearance when it is necessary to properly conduct the trial. [Cit.]" *Lewis v. State*, 164 Ga. App. 549 (1) (297 SE2d 303) (1982).

13. Appellants claim that they were denied a fair trial because their co-indictee, Droxler, testified as a witness for the State and his name was not included on the list of witnesses prepared by the State pursuant to OCGA § 17-7-110. "The purpose of [OCGA § 17-7-110] is to 'insure that an accused is not confronted at trial with testimony against him from witnesses whom he has not had an opportunity to interview prior to trial.' [Cit.] When, as in this case, a witness' name is contained in the indictment, a defendant cannot validly contend that he had been surprised or unable to interview the witness in question through lack of knowledge of such witness. Therefore the trial court committed no harmful error. [Cit.]" *Herring v. State*, 238 Ga. 288 (2) (232 SE2d 826) (1977). See also *Lewis v. State*, 159 Ga. App. 135 (1) (282 SE2d 750) (1981). We note further that, out of the presence of the jury, counsel for Droxler told the trial court that he had made his client available for interviews by defense counsel prior to trial, and that the attorneys representing appellants had met with Droxler for approximately one hour. Such information reinforces the finding of lack of surprise on the part of appellants at Droxler's appearance at trial on behalf of the State.

14. Droxler, as well as another witness for the State, testified that appellants had been incarcerated in Alabama immediately prior to their escapades in Georgia. Appellants claim that this testimony impermissibly placed their character in issue.

" 'The general rule is, that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent from that for which he is on trial, even though it be a crime of the same sort, is irrelevant and inadmissible.' [Cits.] However, where such evidence of other criminal transactions is part of the res gestae or tends to show motive, or to show a course of conduct pointing toward and leading to the crime or to the concealment of the crime or the identity of the perpetrator thereof, such evidence is admissible as an exception to this general rule. [Cits.]" *Spurlin v. State*, 228 Ga. 2 (4) (183 SE2d 765) (1971). The two witnesses whose testimony is questioned related that appellants escaped from the jail in which they were confined, drove a sheriff's car to the home of Graham's parents where they got the shotgun and ammunition, as well as the vehicle which they drove to Georgia and abandoned at the site where they kidnapped Mr. Horsley and took his station wagon. Thus, the testimony concerning appellants' incarceration did refer to parts of the res gestae of the offenses with which appellants were charged, and fit into the narrow exception enunciated in *Spurlin*. See *Richards v. State*, 157 Ga. App. 601 (1) (278 SE2d 63) (1981). See also *Bradley v. State*, 154 Ga. App. 333 (268 SE2d 388) (Carley dissent) (1980).

15. During the testimony of the physician who treated Officer

Harper's wounds, the State introduced photographs of Harper's injuries. The pictures were admitted over the objections of defense counsel that they were irrelevant and inflammatory.

The indictment charged appellants with using a deadly weapon, the shotgun, to commit the aggravated assault on Officer Harper. Thus, assault with a deadly weapon was an essential element of the offense of aggravated assault upon the police officer (OCGA § 16-5-21 (c)), "and it was necessary to describe the injuries inflicted to establish that the gun used by [appellants] was capable of being a deadly weapon." *Haygood v. State*, 142 Ga. App. 627 (3) (236 SE2d 696) (1977). In *Haygood*, a witness was allowed to exhibit stab wounds and surgical scars to establish the deadly character of the knife used in the assault. It was not error in the present case to admit the photographs of Officer Harper.

16. After the State rested and the trial court ruled on appellants' motions for directed verdict, appellants Graham and Wood sought a continuance until the following morning. The continuance was denied and each defendant rested without putting on any evidence. Graham now appeals from the denial of the continuance.

"All applications for continuances are addressed to the sound legal discretion of the court and, if not expressly provided for, shall be granted or refused as the ends of justice may require." OCGA § 17-8-22. "The grant or denial of a continuance is within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of an abuse of discretion. [Cit.] . . . [D]efendants have failed to demonstrate how additional time would have benefited them or how the lack of time harmed them. [Cit.] For that reason, we find no error in the trial court's denial of appellants' motion for continuance." *Wilson v. State*, 158 Ga. App. 174 (1) (279 SE2d 345) (1981).

17. Appellant Jordan maintains that the trial court committed reversible error in the sentencing phase of the trial when it admitted into evidence his prior record of which, appellant contends, he was not given timely notice.

"[OCGA § 17-10-2 (a)] provides that upon the return of a guilty verdict by a jury in a felony case, a pre-sentence hearing shall be conducted to determine the punishment to be imposed. At this hearing additional evidence in extenuation, mitigation, and aggravation of punishment, including the defendant's prior record, may be heard. The statute provides, however, that evidence on aggravation shall be admissible only if the defendant has been given this evidence prior to trial." *Herring v. State*, supra, Division 4.

The record reflects that the assistant district attorney orally notified defense counsel at a pre-trial motions hearing of the prior convictions the State would use in aggravation in the event the jury returned guilty verdicts. At that time he noted that certified copies of

the convictions had been delayed but would be made available to defense counsel as soon as possible. The assistant district attorney also requested the court to delay sentencing to insure that defense counsel had sufficient time to review the prior convictions tendered. Appellants were found guilty on February 3, 1982, and sentenced on February 8, 1982.

" 'All the statute [OCGA § 17-10-2 (a)] requires is "clear notice" to an accused of all previous convictions that the state intends to introduce at trial.' *Potts v. State*, 241 Ga. 67, 83 (243 SE2d 510) (1978). Although the defense counsel did not receive *written* notice of the prior convictions [prior to the commencement of the trial, they] did receive the 'clear notice' required by *Potts*, supra. [Cit.]" *Fox v. State*, 163 Ga. App. 601 (2) (295 SE2d 563) (1982). That being so, there was no error in the admission of the prior convictions.

18. Appellant Graham argues that the trial court's instructions to the jury on the rebuttable presumptions that a person of sound mind intends the natural and probable consequences of his acts, and that such acts are presumed to be the product of that person's will, were burden-shifting, in violation of the United States Supreme Court's holding in Sandstrom v. Montana, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979). The charges complained of are nearly identical to those scrutinized and found to be sufficient in *Bridges v. State*, 246 Ga. 323 (3) (271 SE2d 471) (1980), and *Skrine v. State*, 244 Ga. 520 (260 SE2d 900) (1979). Thus, the trial court did not err in giving those charges to the jury.

19. At the hearing on the motion for new trial, it was revealed that the Cobb County Sheriff's office, at the request of the district attorney, had checked its files to determine if any potential juror in this case had run afoul of the law in Cobb County. The captain in charge of the records stated that he recalled that four or five persons whose names were on the list of potential jurors had had local police records.

Appellants contend that they were denied a right to equal access to the material. Even assuming that such a right exists, appellants have not shown how they were denied that right. The sheriff testified that it was sometime after the completion of appellants' trial that it was decided not to disburse the information gleaned from the local records to defense attorneys who requested it. Attorneys for appellants admitted that they never requested the information from the sheriff's office or the district attorney. Thus, we fail to see any harm appellants suffered from the district attorney's use of the material.

20. Appellant Graham enumerates as error the denial of his motion for mistrial made at the conclusion of the State's closing argument. However, in light of the dearth of authority or argument presented on that alleged error, we must deem it abandoned in accor-

dance with Court of Appeals Rule 15 (c) (2).
*Judgments affirmed. Banke, P. J., and Pope, J., concur.*

DECIDED JUNE 20, 1984.

*Ted B. Herbert*, for appellant (case no. 67798).
*Roland R. Castellanos*, for appellant (case no. 67808).
*Kathryn M. Hardy, Elizabeth M. Leonard*, for appellant (case no. 67809).
*Thomas J. Charron, District Attorney, Debra H. Bernes, Nicolette Templer, Assistant District Attorneys*, for appellee.