A93A1927, A93A1928. BAUGHER v. THE STATE (two cases).
(440 SE2d 768)

ANDREWS, Judge.

Anthony and Montgomery Baugher, who are brothers, were each charged with one count of armed robbery, six counts of aggravated assault, and one count of false imprisonment. They were tried jointly

and convicted. In Case No. A93A1927, Anthony Baugher appeals and in Case No. A93A1928, Montgomery Baugher appeals.

Evidence at trial was that on the night of February 3, 1991, the Battle Food Store in Cherokee County was robbed by two armed men. After both men entered the store, one man took employees Becky Pratt, Linda Connell, and Mark Shephard to the bread section of the store and forced them to lie down. Prior to obeying, Linda Connell activated a hidden silent alarm. The second man forced store manager Ronald Chapman to open the safe and remove money from it.

The men had a portable police scanner, which they listened to as they robbed the store. The robbers unsuccessfully attempted to lock the store doors. As customers Johnny Frazier, Jr., Paul Cummings, and Linda Bostar entered the store, they were apprehended and also forced at gunpoint to lie down. The gunmen fled when they heard that the police were coming.

Detective Richard Escher testified at trial that he responded to the robbery report on February 3, 1991. He discussed the incident with several witnesses and obtained descriptions from them of the robbers. With the witnesses' help, Escher prepared composite drawings.

The next night, Detective Escher received an anonymous tip concerning the identity of the armed robbers. The tipster identified the Baughers and identified the car they had used in the robbery as belonging to Paula Kellums. The tipster was later identified as Chad LeCroy. Subsequent to the relay of this information, on February 10, 1991, the Baughers and Sheila West were arrested at a hotel room the three were staying in.

Escher testified that following their arrest, several items of personal property were seized from their hotel room, which items were later identified by the victims. A Realistic brand police scanner, a green head cap, a green army jacket, and a brown and blue flannel jacket were seized. The clothes were identified as those which the men wore during the robbery.

Detective Escher testified that a photographic line-up was held on February 5, 1991, in which neither Baugher brother was identified. A second photo line-up was held on June 12, 1991, and Montgomery Baugher was identified by four of the witnesses. During the second line-up, no one was able to make a positive identification of Anthony Baugher, though one of the witnesses testified that she thought she recognized Anthony from the robbery.

Officer Richard Zimmerman of the Cherokee County Sheriff's Department testified. He stated that he had participated in the arrest. He testified that among the items seized that day was a police call book of radio frequencies which had been sold to Paula Kellums in

December 1990. Zimmerman also identified a handwritten list of radio frequencies.

Officer Lawrence West of the Bartow County Sheriff's Department testified that the arrest took place after the vehicle matching the description of that used in the robbery, was reported to be in front of a hotel.

Several witnesses to the robbery testified regarding the events set forth above. Anthony Baugher was identified in court by three witnesses and Montgomery was identified in court by three witnesses.

William LeCroy testified that he knew Paula Kellums because she fenced items that he stole. He stated that it was Kellums' car which had been involved in the robbery. He recalled that the Baughers had also gotten the police scanner from Kellums.

LeCroy stated that on February 3, 1991, he went to a hotel room where Kellums was staying and that Anthony and Montgomery Baugher were in the room. Both men talked about the robbery of the Battle Food Store which they had just executed. LeCroy stated that Montgomery dyed Anthony's hair black and that Anthony wore Kellums' eyeglasses as part of the disguise.

Chad LeCroy, Williams' brother, also testified. He stated that he knew Kellums and that through her he met the Baughers. He stated that they told him about their robbery of Battle. The Baughers described the actions each man had taken in the robbery. LeCroy identified a hunting jacket which was found in the Baughers' hotel room as one he saw in their hotel room the night of the robbery.

The defense did not call any witnesses.

### Case No. A93A1927

1. In his first enumeration of error, Anthony Baugher contends that the trial court erred by not granting his motion to sever parties. In particular, he claims: a) that the severance should have been granted because the introduction of Montgomery's statement violated the rule from *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968); b) that the severance should have been granted because the evidence admitted against Montgomery created a spillover effect as to Anthony; and c) that the court erred by failing to exercise its discretion in the consideration of the motion in accordance with Uniform Superior Court Rules 3.1, 3.2 and 3.3.

(a) Anthony Baugher filed a motion to sever prior to trial. He argues that the trial court should have granted the motion because although he had not made any statements to the police, Montgomery gave a statement which also incriminated him. Citing *Hicks v. State*, 262 Ga. 756 (1) (425 SE2d 877) (1993), Anthony claims that severance was mandated because of the prejudice which would arise from Mont-

gomery's statement.

Detective Escher testified regarding the statement. He stated that after Montgomery was arrested and read his rights, he talked to him about the armed robbery. Montgomery stated that he had never hurt anybody and that "[b]esides the guns weren't loaded." Detective Escher stated: "And I told him — I said, it was — what really surprised me overall, I said is the fact that people were still walking in on you while you were doing this armed robbery. And I looked at him and I laughed and I said, 'What were you thinking about when people were walking in on you?' And then he went ahead and made the statement that — I'll read it from here. He advised me — he said, 'You are good.' And he said — that's when I asked him again, 'What were you thinking about when people were walking in on you?' Monty then stated and he was laughing when he said it and he said, 'Well, I'll tell you. The damn door won't lock. I tried to lock that thing three times and it won't lock.' " After this statement, Montgomery invoked his rights and made no further statement.

Under these circumstances, the admission of Montgomery's statement did not violate the *Bruton* rule. "For the admission of a co-defendant's statements to constitute a *Bruton* violation . . . the statements *standing alone* must *clearly inculpate* the defendant." (Citations and punctuation omitted.) *Owens v. State*, 193 Ga. App. 661, 662 (3) (388 SE2d 712) (1989). Because the record shows that Montgomery's statement was not inculpatory of Anthony, the trial court did not err in admitting the statement into evidence.

(b) Anthony Baugher's second argument is that the severance should have been granted because of the "spillover" effect of a joint trial. He claims that the identification procedures and the testimony of the LeCroy brothers were confusing. He claims that the evidence against him was minimal and that he was convicted because of the evidence against his brother.

The trial court did not abuse its discretion in denying the motion for severance since "the appellants did not present antagonistic defenses, and virtually all of the evidence tended to show their joint guilt." See generally *Cain v. State*, 235 Ga. 128 (218 SE2d 856) (1975). "This court's decision in *Price v. State*, 155 Ga. App. 844 (273 SE2d 225) (1980) is not authority for a contrary conclusion. There, the evidence against one co-defendant was deemed to be so overwhelming and the evidence against the other so slight that the 'spillover' effect of the evidence against the former was viewed as an important factor in the latter's conviction." *Saleem v. State*, 169 Ga. App. 952, 954 (2) (315 SE2d 487) (1984).

On the other hand, in this case, the evidence against Anthony Baugher was strong. In addition to other evidence, there were several in-court identifications of him; both sets of clothes that the robbers

had worn and the police scanner radio were found with him and his brother; and both LeCroy brothers' testimony implicated Anthony in the robbery.

(c) Finally, Anthony claims that the judge who originally heard the motion to sever should have decided it and that his failure to do so violated Uniform Superior Court Rules 3.1, 3.2 and 3.3. Pretermitting the issue of whether this argument was properly preserved, it is without merit. The judge who presided over the motions hearing inquired as to the evidence against Anthony and was told that certain testimony implicated him. Because the expected evidence was not "concrete" enough, the presiding judge reserved ruling until trial.

At the beginning of the trial, the trial court stated that it would deny the motion to sever to the extent that it was based on the *Bruton* rule, but that it would reserve a ruling regarding the spillover effect "until such time that it might appear that it would be impossible for this Defendant to get a fair trial as the evidence develops." We find no error in the trial court's handling of the matter.

2. In his second enumeration of error, Anthony Baugher claims that the court erred by not granting his motion for mistrial for commenting on his silence. The alleged error occurred during the direct examination of Detective Escher, as follows: "Q. All right. Now, at this point in time you've made the arrests of the two defendants, Tony and Montgomery Baugher, then what happened? A. Then we brought in Tony to interview. Q. All right. We won't go into the content of that. Then after. . . ."

Anthony Baugher moved for a mistrial, the court found no impropriety in the statement and implicitly denied the motion for mistrial. There was no request for curative instructions.

Citing *Mallory v. State*, 261 Ga. 625 (4) (409 SE2d 839) (1991), Anthony argues that despite the fact that he made no statement, the clear implication was either that he did give a statement, the contents of which could not be divulged, or that there was no statement. We disagree and find no error.

3. Thirdly, appellant claims that the conviction should be reversed since the cumulative effect of the errors enumerated above deprived him of a fair trial. "This state does not follow a 'cumulative error' rule of prejudice. Any error of record . . . must stand or fall upon its own merits and is not aided or aggravated by the accumulative effect of other claims of error." (Citations omitted.) *Thompson v. State*, 201 Ga. App. 646, 649 (5) (411 SE2d 886) (1991).

*Case No. A93A1928*

1. In his first and fifth enumerations, Montgomery Baugher claims that the trial court erred in denying his motion for new trial

since the verdict was contrary to the law and against the weight of the evidence, and that the court erred in denying his motion for directed verdict. In addition to the general arguments, he claims that there was insufficient evidence that one of the victims, who did not testify at trial, was the victim of an aggravated assault.

Appellant's first and fifth enumerations are without merit. There was evidence that the specified victim was forced to lie down at gunpoint. The evidence with regard to that count, and generally, was sufficient to convict under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Montgomery Baugher next claims that the trial court erred in denying his motion to suppress his statement.[1] He was interrogated the morning of his arrest having, he claims, slept only two or three hours the night before. He claims that he had consumed almost three six-packs of beer, but that he was not questioned about drugs or alcohol. He denied being read his rights and repudiated his statement.

At the hearing on the motion to suppress, Detective Escher testified that he informed Montgomery of his rights by reading a *Miranda* card. In Escher's opinion, he did not appear to be under the influence of alcohol or drugs, nor did Escher detect an odor of alcohol. Escher concluded that Montgomery freely and voluntarily waived his rights and thereafter made certain incriminating statements. Montgomery ultimately did exercise his rights and terminate the interview.

Officer Zimmerman was also present when Montgomery made his statement. He corroborated that the *Miranda* rights were given. In Zimmerman's opinion, Montgomery did not appear to be under the influence of alcohol, nor did Zimmerman detect an odor of alcohol. Both officers testified that no promises or threats were made to Montgomery.

Montgomery claimed that the officers did not advise him of his rights until after he had been questioned. He contended that he told them that he wanted to remain silent. Montgomery conceded that he had been arrested on several other occasions for unrelated crimes and had been *Mirandized* and questioned. He stated that he knew he did not have to answer in-custody questions when the officers talked to him.

The court found no evidence of involuntariness. Further, the court found that Montgomery was properly advised of his constitutional rights and voluntarily and knowingly made the statement.

A trial court's finding as to the facts and the credibility of witnesses relating to the admissibility of a confession should be upheld unless clearly erroneous. *Price v. State*, 201 Ga. App. 435, 436 (1) (411

---

[1] The contents of that statement are set forth above in Division 1 of Case No. A93A1927.

SE2d 343) (1991). Since the evidence in this case supports the finding of the trial judge, the statement was properly admitted. See generally *Peebles v. State*, 260 Ga. 165, 166 (4) (391 SE2d 639) (1990); *Bonilla v. State*, 204 Ga. App. 424 (3) (419 SE2d 495) (1992).

3. Thirdly, Montgomery claims that the trial court erred in denying his motion to suppress the identification testimony. As set forth above (Division 1 (b)), during the first photographic line-up neither man was identified. In the second line-up Montgomery was identified by four witnesses and at trial he was identified by two witnesses. At the pretrial hearing the court found that there was nothing impermissibly suggestive about the second line-up.

Here, Montgomery argues that the pretrial identification procedure was impermissibly suggestive and that it and the subsequent in-court identification violated his due process rights. Specifically, he claims that the witnesses who identified Montgomery in the second line-up admitted seeing a newspaper article containing his picture. He argues that two of the witnesses who identified him at the photographic line-up later identified his brother, not him, at trial. He claims that Escher complimented three of the witnesses on their selections during the photographic line-up. He argues that his picture in the line-ups was distinct and that both times was in the same position. He argues that two names appeared on the back of photographs and that this was improper. Moreover, he claims that most witnesses saw the robbers for only a few seconds.

We have reviewed the photographic line-up and find that it was not impermissibly suggestive. See generally *Truelove v. State*, 198 Ga. App. 14 (1) (400 SE2d 396) (1990); *Graham v. State*, 171 Ga. App. 242, 253 (11) (319 SE2d 484) (1984); *Simpson v. State*, 193 Ga. App. 439, 440 (388 SE2d 39) (1989); *Jones v. State*, 251 Ga. 361, 362 (1) (306 SE2d 265) (1983). Detective Escher's vague comments to the witnesses regarding their selections *after* they made their choices did not impermissibly taint the subsequent in-court identifications. See generally *Dodd v. State*, 236 Ga. 572 (224 SE2d 408) (1976). Further, the fact that the witnesses observed a picture of him in the newspaper did not impermissibly taint the procedure. See *McClesky v. State*, 245 Ga. 108 (2) (263 SE2d 146) (1980). The four witnesses testified that despite seeing the suspects' pictures in the newspaper, they identified Montgomery Baugher completely from memory. One of the witnesses stated that the newspaper photograph did not resemble Montgomery.

With regard to the in-court identification, "[w]hether a subsequent in-court identification is tainted depends on all the circumstances of the case. Conviction based on eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the photographic identification procedure was so impermissi-

bly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." See *Daniels v. State*, 207 Ga. App. 689, 691 (4) (428 SE2d 820) (1993). The pretrial identification procedure here was not impermissibly suggestive and we reject Montgomery's argument that the subsequent in-court identification was tainted. See generally *Shadrick v. State*, 156 Ga. App. 182 (274 SE2d 156) (1980).

Even assuming arguendo that the photographic identification procedure was impermissibly suggestive, there was not a substantial likelihood of irreparable misidentification. The second prong of this test considers: "(1) the opportunity of the victims to view the perpetrator at the time of the crime; (2) the victims' degree of attention; (3) the accuracy of their prior descriptions of the perpetrator; (4) the level of certainty of their identifications; and (5) the length of time between the crime and the confrontation." *Banks v. State*, 203 Ga. App. 355, 356 (416 SE2d 866) (1992).

Here, the witnesses who identified Montgomery at trial testified that they were able to observe him at the time of the crime and based their trial testimony on that recollection. All three testified that they got a good look at him. There was testimony that the store was well-lit and two of the witnesses looked at Montgomery for a while. The witnesses remembered details of his appearance and described him immediately after the crime. They helped Detective Escher create composite drawings of him. We do not find a substantial likelihood of irreparable misidentification and the trial court did not err in allowing these identifications. See also *Jacobs v. State*, 207 Ga. App. 714 (1) (429 SE2d 256) (1993).

4. Montgomery Baugher next contends that the court erred in admitting the hearsay testimony of William LeCroy regarding statements made to him by Paula Kellums. The court allowed her statements under a conspiracy theory pursuant to OCGA § 24-3-5. Here, Montgomery argues that no conspiracy with Kellums was proved and that therefore the statements were inadmissible hearsay.

The fact that Kellums was not indicted is not dispositive of this issue. See *Porterfield v. State*, 137 Ga. App. 449 (1) (224 SE2d 94) (1976). During the hearing outside of the presence of the jury, the State proved that Kellums was with the brothers before and after the robbery, that they drove her car in the robbery, that Kellums was to receive $500 for her help, and that Kellums provided eyeglasses as a part of the robbers' disguise. There was sufficient evidence of Paula Kellums' role as a conspirator to allow the statements under this provision. See *Boswell v. State*, 158 Ga. App. 727 (282 SE2d 196) (1981).

Moreover, assuming arguendo that the introduction of this testimony was error, it was harmless since it was repeated in Chad LeCroy's testimony.

*Judgments affirmed. Pope, C. J., and Birdsong, P. J., concur.*

DECIDED FEBRUARY 10, 1994.

David L. Cannon, for Anthony Baugher.
William A. Jordan, for Montgomery Baugher.
Garry T. Moss, District Attorney, Cecelia V. Moutoux, Assistant District Attorney, for appellee.