## A04A0257. ALLEN v. THE STATE.
### (602 SE2d 250)

ADAMS, Judge.

Joseph E. Allen appeals following his conviction on numerous counts of armed robbery, robbery by intimidation, kidnapping, possession of a firearm by a convicted felon and possession of a firearm during the commission of a crime. We affirm.

This case arises out of a series of robberies in the Savannah area from August 1999 through February 2000. In the first of these incidents, Kathleen Williamson was working at a dry cleaning business about 2:00 p.m. on August 31, 1999, when a man came in to ask about the price for cleaning church robes. The man left, but returned a short time later and robbed her with a small, black handgun. The man took all of the money out of the cash drawer, except the $1 bills. On September 27, 1999, at around 3:00 p.m., Williamson was robbed again at the same location by the same person that robbed her several weeks earlier. He told her, "You know who I am and you know what I want," but did not display a weapon. Williamson pulled the money out of the cash drawer and gave it to the man.

At around 5:00 p.m. on November 2, 1999, Louise Thompson was working the front desk at a motel when a man came in and inquired about room rates. He walked away, ostensibly to ask his girlfriend a question, but turned around with a "chrome-looking small pistol" in his hand. The man demanded money and left after cleaning the bills out of the motel cash drawer. He threatened to kill Thompson if she called the police. Four days later, Sherolyn Ortt was working at the front desk of a motel at around 6:00 p.m. when a man came in to use the bathroom. When he came out of the restroom, he left the lobby, but then returned and asked if he could speak with someone about group reservations. When Ortt replied that she was the only one there, the man drew out a handgun and laid it on the counter. Ortt described the handgun as small, with a silver part in the front. He demanded money, directing Ortt to pull out the cash drawer. The man took the bills and left.

At around 5:30 p.m. on November 21, 1999, Edna Mae Beaufort was working as a desk clerk at a motel when she stepped into the back for a moment. When she came back out, a man was standing at the motel counter and asked about the weekly rate for a room. Beaufort told the man that her supervisor handled weekly rentals, and then stepped into the back room again to check the schedule to see when her supervisor would be there. When she returned, she saw a "little silver gun" on the counter, and the man demanded money. Beaufort pulled the bills out of the cash drawer and handed them to him. The man put the money in his pocket and began to walk away. He then turned and asked about the surveillance tape. The man went into the back, returned with a videotape in his hand, and left.

On December 21, 1999, Simone Simmons was working the night window of a motel. At some point after 11:00 p.m., she had just prepared the cash in her drawer to drop it in the safe. Before she could drop the money, a man appeared and slid a chrome gun under the window. He demanded money. Simmons gave him the money and he left. Two days later, Marquita Nelson was working as the front desk clerk at a different motel during the night shift when a man came to the window between 8:30 p.m. and 10:00 p.m. and asked about room rates. He indicated that he wanted to get a room, and Nelson lifted the window to give him the necessary paperwork. When she did so, the man pulled out a silver pistol. The man directed Nelson to give him all the money in the cash drawer, which she did. He told her to go into the bathroom and count for 20 seconds. He said that if she came out earlier he would shoot her. The man then took off running.

On January 11, 2000, Tamea Ellis had locked the doors at the dry cleaners where she worked and began tagging clothes. Sometime between 5:00 p.m. and 6:00 p.m., a man approached the door and began looking through his wallet. Thinking he was there to pick up clothes, Ellis opened the door. The man demanded all the money in the register, and showed Ellis that he had a silver-handled gun tucked in his pants. She gave him the money and he walked out.

At around 6:30 on the evening of January 13, 2000, Michael Lovett and Jeffrenia Tatum were working at a music store when a man came in and began to look around. Lovett asked him if needed any help and the man said, "no." He then came up to the counter and pulled out a silver handgun. The man told Lovett to step back and directed Tatum to hand him the money out of the cash drawer. The man then told Tatum and Lovett to go to the back room of the store and not look back.

On January 21, 2000, LaDawn Robinson was working at a dry cleaners when a man came in at around 6:30 p.m. He asked her to look up a customer's name on the store computer, but she was unable to find the name. Then the man asked her to hand him her money and

unzipped his jacket to reveal a gun. She gave him all the bills in her cash drawer, except the $1 bills because he did not want those. He also asked her for the security videotape. He then walked with her to the back of the store to retrieve the tape. Two days later, Felisha Harris was working as the front desk clerk supervisor at a motel. During the afternoon, she was counting her receipts when a man walked in. He told her to give him the money she was counting. Then he showed her a gun. She gave him the money and the man left. Harris picked up the phone to call police, but the man returned. He told her to put the telephone down and go to the back room. She did so, but later called police.

Three days later, Stacy Weis was working the 3:00 p.m. to 11:00 p.m. shift at a convenience store. Sometime between 10:00 p.m. and 11:00 p.m., a man walked in as Weis was filling the coffee machine. They talked briefly about the weather. Then Weis went behind the counter and asked if she could help him. The man showed her a silver automatic handgun and asked for the money in her register. She handed him the bills and asked if he wanted the change. He said no and then asked for the $50 and $100 bills the store kept under the counter. Weis looked, but there were none. The man then told Weis he wanted the videotape. She walked into the office to get the tape and the man followed. The man grabbed the tape and told Weis to stay there and not to call anyone. About one-half hour after the suspect left, Weis discovered that her brown bomber jacket, which had a distinctive cut on the sleeve, was missing.

Six days later, on January 29, 2000, LaTonya Butler was working as a desk clerk at a motel. Some time after 2:00 p.m., she was working at her computer when a man came in and asked to use the restroom. She told him that the motel did not have a public restroom and suggested that he go to the grocery store across the street. The man left, saying he would be back to get a room. But he immediately returned and pointed a short, silver handgun at Butler and de-manded money. She gave him the money in the drawer, and he asked for her purse. She told him that she did not have "anything." The man then took Butler to the back office, with the gun pointed at her and closed the door. He told her not to come out.

Butler subsequently came out of the back room to call police. She also called the motel's maintenance man, Rodney Velasquez, to let him know what had happened. Velasquez was in the parking lot heading toward the front of the motel when he saw a small truck or SUV with a drive-out tag pulling away. The vehicle was two-toned and the tag had the name "Suzuki" as well as the names of other import cars on it.

On the night of February 1, 2000, Amanda Vaughn was working as a desk clerk at a motel when the door opened and a man walked in

saying, "Shh, give me your money." She looked up and saw a man holding a silver handgun. She gave him the money out of the cash drawer, and he asked for her wallet, which she gave him. He told her to turn around and to go in the back.

The next day, Danielle Gibson was working at a bakery outlet when a man came in, walked around the store a bit and left. The man came back a short time later and stayed in the store, asking a number of questions, until the other customers left. When he came to the counter to make a purchase, the man asked Gibson the price of the sodas. Then the man pointed a small black gun in her face and told her to give him the money. She gave him the money, and he left.

Each of the victims, other than Tatum, identified Allen as the man who robbed him or her from a photographic lineup and at trial. And although Tatum did not identify Allen from a photographic lineup, her co-victim, Lovett, did. And Tatum identified Allen at trial as the man who robbed her. Nelson also identified Allen from a live lineup.

At the time of his arrest, Allen was charged only with the armed robbery of Butler and a separate armed robbery of Harris. Over the next few weeks, Allen was charged with 12 additional armed robberies, as well as a single count of robbery by intimidation. Later, Allen was indicted for armed robbery, kidnapping, two counts of possession of a firearm during the commission of a crime and possession of a firearm by a convicted felon in connection with the incident involving Butler.

The state filed a notice in that case indicating its intent to introduce evidence of the other robberies as similar transactions. The trial court ruled that each of the other 14 incidents could be introduced at trial as similar transactions. Subsequently, the state returned indictments against Allen in the other fourteen cases, totaling thirteen counts of armed robbery, five counts of kidnapping, eighteen counts of possession of a firearm during the commission of a crime, thirteen counts of possession of a firearm by a convicted felon and one count of robbery by intimidation. Before trial proceeded on any of these indictments, the state moved to join all fifteen indictments in one proceeding, and the trial court granted the motion.

The jury returned guilty verdicts on all of the counts, except five of the six counts of kidnapping and the associated counts of possession of a firearm during the commission of a crime. Allen was sentenced to two life sentences, plus five consecutive five-year sentences. The written sentence was amended to indicate that Allen was sentenced as a recidivist under OCGA § 17-10-7 (a). After the trial court denied Allen's motion for new trial, this appeal followed.

1. Allen first contends that the trial court erred in granting the state's motion to join the charges from all fifteen robberies in one

proceeding. He asserts that the cases were joined for trial solely on the basis that they were of the same or similar character, and thus joinder was improper.

Recently, our Supreme Court reaffirmed its holding in *Dingler v. State*, 233 Ga. 462 (211 SE2d 752) (1975), and reconfirmed that this state has adopted the ABA Standards on Joinder of Offenses. *Stewart v. State*, 277 Ga. 138-139 (587 SE2d 602) (2003). The Court noted:

> Under these Standards, a trial court must first determine whether the offenses are joined solely because they are of the same or similar character. If they are, severance is *mandatory*. If they are not, the court must then decide whether severance would promote a just determination of guilt or innocence as to each offense.

(Citations omitted; emphasis supplied.) Id. at 139.

Thus, while mere similarity in the character of the crimes is not enough for joinder, if the crimes are "so strikingly similar as to evidence a common motive, plan, scheme[,] or bent of mind [pattern, then joinder may be appropriate]." *Stewart*, 277 Ga. at 140. The Supreme Court then explained that if the charges are not joined simply because they are of a same or similar character, severance may still be appropriate, although not mandated, because the trial court must determine whether the trier of fact will be able to fairly and intelligently judge each offense. Id. at 139. That determination lies in the trial court's discretion, but in exercising its discretion, the trial court must balance the interest of the defendant against the interest of the state. Id. Thus, the trial court "must look to the number and complexity of the offenses charged and determine whether a trier of fact can parse the evidence and apply the law with regard to each charge." (Citation omitted.) Id. If the trier of fact cannot determine each charge on its own merits, then severance of the offenses is appropriate. Id. In addition, the Supreme Court noted that the inquiry does not end with a determination of whether one offense would be admissible in the trial of another offense. Id. at 140. Rather, the trial court must still determine whether severance "would promote a fair determination of guilt or innocence as to each offense." (Citation omitted.) Id.

Here, the trial court's order granting joinder first noted its prior ruling allowing the admission of the other cases as similar transactions. The order then cited *Dingler*, but held only that the charges involve a series of connected acts, the similarities of which evince a single scheme or plan on the part of Allen. The order did not specifically address the issue of whether the jury would be able to fairly and intelligently determine each offense. Nevertheless, the

trial judge considered this factor at the hearing on the motion, after the defense argued, as it does on appeal, that the joinder of the cases would prejudice the jury's ability to decide each case on its merits. In response, the trial judge noted that she was:

> constantly amazed at the ability of jurors to cut through and look at separate charges. I see it on a very regular basis, where juries will find a defendant not guilty of some and guilty of others, even when there are a series of cases, and the argument that you've just made to me has been made to me.

Allen asserts, however, that the cases are not sufficiently alike to have allowed their introduction as similar transactions or to allow their joinder. But "there is no requirement that the other transaction be identical to the crime charged in every respect" to be admissible as a similar transaction. *Standfill v. State*, 267 Ga. App. 612, 614 (1) (600 SE2d 695) (2004). Rather, "[t]here can be a substantial variation of circumstances where there exists a logical connection between crimes which are essentially dissimilar." *Sweeder v. State*, 246 Ga. App. 557, 559 (2) (541 SE2d 414) (2000). Nor do transactions have to be identical in every respect in order to be joined for trial. Joinder is appropriate where "the similarity of the offenses reaches the level of a pattern which shows a common scheme, plan or a modus operandi so strikingly similar that the totality of the facts unerringly demonstrates and designates the defendant as the common perpetrator." (Punctuation and footnote omitted.) *Houston v. State*, 242 Ga. App. 300, 302 (2) (529 SE2d 431) (2000).

The robberies in this case all involved commercial establishments in the Savannah area over a six-month period. The crimes all involved at least one female victim. And in all but one case, the perpetrator showed the victim a gun and demanded money. The one time the robber did not display a gun was the second Williamson robbery, which involved the same victim, at the same business at approximately the same time of day. And on that occasion, the robber told the victim that she knew who he was and what he wanted, a clear reference to the earlier crime. This connects the second Williamson robbery to the first, which does fit the pattern. See *Anderson v. State*, 238 Ga. App. 866, 876 (8) (519 SE2d 463) (1999).

In all but three cases, the victim was alone at the time of the robbery, and in all but four cases, the perpetrator engaged in casual conversation to put the victim at ease before displaying a gun and demanding money, or alternatively, the perpetrator took some action to dispel suspicion, such as looking around the business as if he were

a customer. For example, there was no preliminary conversation in the Ellis case, but the robber did not arrive until just after the business had closed. Thus, there was no opportunity for conversation. Instead, the perpetrator stood in front of the locked door and searched his wallet as if looking for a ticket to claim his laundry. This put Ellis off guard and tricked her into opening the door.

The remaining cases that involved multiple victims or an absence of such casual action or conversation connect to the pattern in other ways. In the second Williamson robbery, there was no casual conversation and Williamson was not alone, but as we have discussed, that robber connected himself to the prior Williamson robbery. There were two victims in the robbery of the music store, but in that case, the perpetrator entered the store, looked around as if he were just another customer, and declined any help,[1] before pulling a gun and demanding money. Moreover, this incident occurred only two days after the Ellis robbery and approximately one week before the Robinson robbery.

And in the three other cases in which no prior casual conversation occurred, the Harris, Vaughn and Beaufort robberies, each involved a lone female clerk at a motel, the display of a gun and the demand for money. Moreover, these crimes occurred within days of other robberies in the pattern. The Beaufort robbery occurred about one week after the Ortt robbery. The Harris robbery occurred two days after the Robinson robbery and three days before the Weis robbery. And the Vaughn robbery took place three days after the Butler robbery and one day before the robbery at the bakery.

And although there were some differences among the crimes, such as the property taken, the description of the gun or the clothing worn by the robber, the words the robber used or his treatment of the victims, we do not believe that these factual distinctions are sufficient to remove any of the crimes from the pattern. See *Pickstock v. State*, 235 Ga. App. 451, 454-455 (4) (509 SE2d 717) (1998). Moreover, we note that at least one victim from each robbery identified Allen from a photo lineup as the perpetrator.

Thus, because the record demonstrates there were sufficient similarities in the crimes to show a pattern of conduct, the offenses were not joined solely because they are of a same or similar character, and, therefore, severance was not mandatory. *Stewart*, 277 Ga. at 139. And having carefully reviewed the record, we cannot say the

---

[1] It is possible that this exchange may have been somewhat longer, because at the hearing on the motion to suppress, Lovett testified that the man asked him to show him a compact disc, which he did.

evidence was so complex or the cases so numerous that the jury would have been unable to parse the evidence in order to fairly and intelligently decide each case.[2] See *Stewart v. State*, 268 Ga. App. 243 (601 SE2d 755) (2004). Indeed, the jury acquitted Allen of five of the kidnapping counts and the related firearm possession charges, indicating an ability to decide each case separately.

2. Allen next argues that the trial court erred in denying his request for funds for expert testimony on eyewitness identification. Allen contends that the trial court erred in denying his motion for an expert, because this case hinged on eyewitness identification evidence, and that there was no corroborating evidence.

The trial court held a hearing on the motion pursuant to *Brooks v. State*, 259 Ga. 562, 566 (2) (385 SE2d 81) (1989). Under *Brooks*, an application for funds must be considered in an ex parte hearing, with the transcript of the hearing sealed. The state may submit a brief to be considered at the hearing, but the state is allowed to be present when the defendant is examined concerning his indigence. Moreover, the trial court may reserve issues to be heard at a separate hearing with the state present. Id.

Here, the trial court represented at the beginning of the hearing that in lieu of the state's submission of a brief or a separate hearing, trial counsel had agreed to go forward with the hearing in the prosecutor's presence until they reached those portions of argument that the defense desired to present ex parte. Later in the hearing, therefore, the prosecutor was excused and Allen's counsel appeared before the judge ex parte to present a portion of his argument and that transcript was sealed. Although Allen suggests that there was some flaw in this procedure, we find that the hearing complied with *Brooks*, especially in light of trial counsel's consent to the procedure.

Based upon the argument at the hearing and Allen's briefing, the trial court determined that Allen failed to demonstrate why the expert testimony was critical to his case or that such testimony was necessary to prevent his trial from being fundamentally unfair.

The Supreme Court of Georgia has held that before excluding expert testimony in a case where eyewitness identification is an important part of the state's case, a trial court must weigh certain factors:

> Where eyewitness identification of the defendant is a key element of the State's case and there is no substantial corroboration of that identification by other evidence, trial

---

[2] We also note that the trial judge charged the jury that they must consider each and every charge separately.

courts may not exclude expert testimony without carefully weighing whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification.

(Citation and footnote omitted.) *Johnson v. State*, 272 Ga. 254, 257 (1) (526 SE2d 549) (2000).The admission or exclusion of such evidence is within the trial court's discretion, and this Court will not disturb the trial court's ruling absent a clear abuse of that discretion. Id.

The Supreme Court ruled that under the facts of the *Johnson* case that the trial court had not erred in excluding expert testimony on the reliability of eyewitnesses. There, Johnson was convicted of robbing and assaulting a 62-year-old woman at an ATM. Id. at 258. In addition to the eyewitness testimony of the victim and a video surveillance tape, the state presented the testimony of a second eyewitness who had observed Johnson loitering in the area of the crime. Id. at 258-259 (2). The state also presented similar transaction evidence from another incident at an ATM involving a 60-year-old man, in which the defendant was linked to the crime by a license plate number. Id. at 259 (2). The Supreme Court then viewed the proffered expert testimony in light of this evidence and determined that the trial court had not abused its discretion in excluding the expert evidence, even though it found that such evidence "might have been helpful to some degree." Id. at 260 (2).

Here, the state also presented corroborating evidence in addition to the identification testimony of the victims.[3] The state presented evidence that the police had followed up on the description of the getaway car given by Velasquez, the maintenance man at the motel where Butler worked. Recognizing Velasquez's description of the tag listing a number of import brands as similar to those used by an import car dealership in Savannah, police traced the car through the dealership to a car rental agency. There, they discovered that Allen had rented a car matching Velasquez's description near the time of the Butler robbery.

Police obtained a photograph of Allen and used it in the photo lineup they showed to Butler, who identified him as the man who robbed her. Police also executed a search warrant at the address given by Allen in his rental agreement for the car. There, they found a small silver handgun matching the description given by a number of the

---

[3] The reliability of this eyewitness testimony is addressed in more detail in Division 3 below.

victims. They also found a brown bomber jacket matching the description of the jacket taken during the Weis robbery. Weis identified the jacket as hers at trial. And they found clothing that matched the description given by some of the victims. Moreover, the evidence showed that at the time of his arrest, Allen was carrying a black backpack, which had a copy of the car rental agreement.

Thus, as in *Johnson* the state relied upon more than simply the eyewitness testimony of the victims. And after reviewing the proffered expert testimony, we cannot say that the trial court clearly abused its discretion in excluding such testimony even though it may have been "helpful in some degree to the jury."[4] Compare *Brodes v. State*, 250 Ga. App. 323, 325 (1) (551 SE2d 757) (2001) (where the only evidence against the defendant was the victims' identification). See also *Wright v. State*, 265 Ga. App. 855, 858 (1) (b), n. 1 (595 SE2d 664) (2004).

3. Allen next asserts that the trial court erred in denying his motion to suppress the pre-trial and in-court identifications by the victims and in overruling his objections to the identification testimony at trial. Allen's motion asserted that the photographic lineups and police procedures were improperly suggestive.

> Convictions based on a pretrial identification by photograph and a subsequent identification at trial will be set aside only if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U. S. 188, 196 (93 SC 375, 34 LE2d 401) (1972). A court need not consider whether there was a substantial likelihood [for] misidentification if it finds that the identification procedure was not impermissibly suggestive. An identification procedure becomes impermissibly suggestive when it leads the witness to an all but inevitable identification of the defendant as the perpetrator, or is the equivalent of the authorities telling the witness, "This is our suspect."

(Citations and punctuation omitted.) *Williams v. State*, 272 Ga. 828-829 (2) (537 SE2d 39) (2000).

The trial court held an extensive pre-trial hearing over two days on Allen's motion to suppress, during which the victims and the police officers testified. The evidence from the hearing showed that in each

---

[4] Additionally, just as in *Johnson*, we note that the trial court charged the jury in language that closely follows the pattern jury instructions to identify the factors for the jury to use in assessing the reliability of eyewitness identification. See *Johnson*, 272 Ga. at 260, n. 6.

instance, the victims were shown at least one, or in a number of cases, more than one photo array. Allen did not become a suspect until Velasquez saw his car leaving the Butler robbery, and, therefore, his photograph was not placed into a lineup until February 3, 2000. A number of the victims were unable to identify a suspect from the earlier photo arrays, but made an identification after Allen's photograph was included in a subsequent array. All of the victims in the case, with the exception of Tatum, identified Allen from the photographs. Only Nelson identified an individual other than Allen as the man who committed the robbery. But when she was shown a subsequent photo lineup which included both a photograph of the man she had identified and Allen, she selected Allen's picture. She confirmed this identification in a live lineup through visual and voice recognition.

The photographic lineups included an array of six males, with similar facial features to Allen and a mustache, such as Allen had. The evidence showed that in each case, the detective made no statement or suggestion to the witness as to whether they had a suspect in the case, nor did detectives single out a particular photograph for the witness' attention. And in each case, police read or had the witness read, a pre-printed admonition to the witness indicating that the lineup may or may not contain a picture of the person who committed the crime.

Based upon this evidence, the trial court concluded that the pre-trial identification procedures were not impermissibly suggestive. From our review of the record, we find no abuse of discretion in this determination. See *Ivey v. State*, 277 Ga. 875, 876 (3) (596 SE2d 612) (2004); *Johnson v. State*, 271 Ga. 375, 381 (11) (519 SE2d 221) (1999).

On appeal, however, Allen argues in particular that the identification by five of the witnesses — Robinson, Beaufort, Ellis, Lovett and Nelson — should have been excluded. In reviewing these identifications, we consider the following factors established by the United States Supreme Court in *Neil v. Biggers*:

> (a) the opportunity of the witness to view the criminal at the time of the crime, (b) the witness' degree of attention, (c) the accuracy of the witness' prior description of the criminal, (d) the level of certainty demonstrated by the witness at the confrontation, and (e) the length of time between the crime and the confrontation.

(Citations omitted.) *Isaacs v. State*, 213 Ga. App. 379, 380 (2) (444 SE2d 409) (1994). "The ultimate question is, whether under the

totality of the circumstances, the identification is reliable." (Citations omitted.) *Semple v. State*, 271 Ga. 416, 418 (2) (519 SE2d 912) (1999).

(a) *Robinson*

Allen asserts that the identification by Robinson should have been excluded because she testified that she picked his picture only as the suspect "most likely" to have robbed her. Further, she testified that she knew that she had picked out the man police suspected because they did not show her any other photographs. Moreover, the police told her Allen's name at that point.

But the hearing transcript shows that Robinson testified that she knew Allen was the man who robbed her when she first saw his picture, not that he was the most likely to have robbed her. And as the trial court found, Robinson had ample time to view the man who robbed her, she looked directly into the man's face, she was certain of her identification and she made the identification only a few weeks after the robbery. The record from the hearing and the trial are conflicting as to the description that Robinson gave police. But we agree with the trial court that neither that confusion, nor the fact that police told Robinson Allen's name after she made the identification were sufficient to taint her pre-trial identification. See *Jones v. State*, 226 Ga. App. 428, 431 (3) (487 SE2d 62) (1997); *State v. Willis*, 218 Ga. App. 402, 403 (2) (461 SE2d 576) (1995).

(b) *Beaufort*

Beaufort was unable to identify the man who robbed her from the first lineup shown to her by police. She was shown a second lineup and picked out Allen, but that lineup had a photograph that had also been used in the prior lineup. Allen asserts that this was improper because Beaufort had already excluded that man as a suspect and he asserts that this impermissibly limited the array from which Beaufort could identify the robber.

Beaufort's testimony showed that she had ample time to view the man who robbed her and that she focused on his face. She gave a description of the man to police, which did not conflict with a description of Allen. And out of the lineups shown to her, she picked only Allen and was certain in her identification. Although one man's picture was included in both lineups, given the other factors, we agree with the trial court that this does not impermissibly taint her identification of Allen in the second lineup.

(c) *Ellis and Lovett*

Allen argues that the identifications made by Ellis should have been excluded because she testified that she saw a photograph of Allen on television before making her identification on February 4, 2000. Similarly, Lovett testified that he heard a description of Allen on the news prior to viewing the photographic lineup the same day. But Allen was arrested on February 3, 2000, and the police waited

until all the identifications had been made before releasing his photograph and information to the media. However, the man that Nelson originally identified as the robber was arrested on January 13, 2000, two days after Ellis was robbed and the day Lovett was robbed. Allen asserts that Ellis and Lovett may have seen or heard information about this man prior to making their identifications. Allen contends that this throws doubt on their identifications of Allen, who is similar in appearance to the other man.

The evidence shows that both Ellis and Lovett each had the opportunity to view the man who robbed them. Lovett described the man to police, and when shown the photo array immediately selected Allen and was certain of his identification. Although he had heard the prior description, Lovett testified that he picked Allen's photo out of the lineup because he was the man who had robbed him, not because he was the man who matched the description he had heard.

Although Ellis testified that she was with the man who robbed her less than one minute, she said that the man did not have his face covered and she could see him clearly. She looked into his face. She described him to police and identified him from the photographic lineup. And she stated that her identification of him was based upon what she saw at the time of the robbery and not upon the photograph she saw on television or anyone else's suggestion. Moreover, both the Ellis and Lovett identifications were made within a few weeks of the respective crimes.

And even if these witnesses saw or heard something in the media referring to Allen or the other man before making their identifications, such information is not enough to taint their identifications. See *Semple v. State*, 271 Ga. at 417-418 (2); *Baugher v. State*, 212 Ga. App. 7, 13-14 (3) (440 SE2d 768) (1994). We find that under the totality of the circumstances, the trial court correctly found that these identifications were reliable.

(d) *Nelson*

Nelson testified that the robbery at the night window of her motel took about three to four minutes and that she was able to see the person who robbed her. After the robbery, Nelson remembered a man who had recently rented a room at her motel, who resembled the man who had robbed her. She looked through the motel files and retrieved the picture identification of the man she had in mind. She gave it to police and he was later identified as James Russell Simmons. Nelson subsequently selected Simmons's picture out of photo lineup prepared by police. Nelson was asked to view a second photo lineup containing the photos of both Simmons and Allen. At that point she selected Allen's picture. Police then showed her a live lineup with both Simmons and Allen, along with four other men. She chose Allen out of that lineup based upon his appearance, particularly his height,

and his voice, which she recognized. She was certain in her identification. Although Nelson testified that Allen was much taller than the other suspects in the live lineup, the detective who arranged the lineup said that he had three individuals with similar height and build as Allen and three with similar height and build as Simmons. After she selected Allen from the live lineup, she saw his name on the form she signed to show her identification.[5]

Allen takes issue with this procedure and also the fact that police failed to preserve a photographic record of the live lineup. Based upon the totality of the circumstances, however, we agree with the trial court's determination that Nelson's identification was reliable.

Further, based upon our review of the trial transcript, we find no error in the trial court's admission of the in-court identifications by the victims.

4. Allen contends that the trial court erred in granting the state's motion in limine, which prevented Simmons and Alton Lovett from being in the courtroom. Allen also sought to introduce photographs of Simmons and Lovett to show their similarity in appearance to him, and asserts that their exclusion was error. Allen sought to introduce this evidence to show that a facial similarity existed between these men and him once their head and facial hair had been removed in the prison system. In addition, Simmons had been a suspect in several of the robberies and was previously identified by Nelson, and his photograph had been included in some of the lineups shown to the victims.

> Certainly a defendant is entitled to introduce relevant and admissible testimony tending to show that another person committed the crime for which the defendant is tried. However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature.

(Citations omitted.) *Klinect v. State*, 269 Ga. 570, 573 (3) (501 SE2d 810) (1998).

Based upon our review of the record, we cannot say that the trial court erred in excluding this evidence because Allen failed to connect

---

[5] Although Allen contends that Nelson saw his name before the live lineup, her testimony at the motion hearing was that she saw it *after* the live lineup. His trial counsel then used this testimony to refresh Nelson's recollection at trial, but then somehow elicited the contradictory testimony that she had seen his name before the live lineup. But even if she heard the name before the live lineup, we do not believe that was sufficient to render her testimony unreliable.

these two men to the crimes at issue or to prove that they committed similar crimes. Although Nelson had originally identified Simmons as the man who robbed her, she eliminated him as a suspect after she saw the live lineup and heard both men speak. Moreover, Simone Simmons, the victim in the December 21, 1999 robbery, is James Simmons's cousin. She testified that while the two men looked alike, her cousin was smaller than Allen and she knew that he was not the man who robbed her. There was absolutely no evidence linking Lovett to the crimes at issue.

And although Allen asserts that these two men committed similar crimes, there is nothing in the record to show anything other than the fact that they were convicted of armed robbery in the Savannah area. The record does not disclose the details of such crimes, and thus Allen failed to establish their similarity to the crimes at issue. Moreover, Simmons was arrested on January 13, 2000, which places him in jail during the commission of the last six of the robberies in this case. And we note that Simmons's picture was a part of the record at trial as it was included in a number of the photographic lineups shown to the victims.

We find *Johnson v. State*, 246 Ga. App. 239 (539 SE2d 914) (2000), upon which Allen relies, distinguishable. This Court ruled in that case that it was error for the trial court to exclude photographs of the defendant's two nieces to show their physical similarity to the defendant. Id. at 242-243 (5). But in that case there was at least some evidence linking the two women to the crime at issue, and the evidence showed that the crime had been committed by two women. Id. at 241-242 (4). Moreover, in that case, this Court found that the photographic array shown to the victim was impermissibly suggestive, but was constrained from so ruling because the defendant had not challenged the array on appeal. Id. at 241 (2).

5. Allen also argues that the trial court erred in allowing the state to elicit hearsay testimony from one of the detectives who investigated the robberies. Having reviewed the argument and the record, we find no ground for reversal. Assuming, without deciding, that the state elicited certain hearsay testimony from the detective, we find that its admission was harmless in light of the other evidence in the case. "The erroneous admission of hearsay testimony is harmless where it is cumulative of legally admissible evidence of the same fact, where it does not touch on the central issue of the case, *or* it could not have contributed to the verdict in light of [the] eyewitness testimony regarding the crime." (Citations omitted; emphasis supplied.) *Myers v. State*, 275 Ga. 709, 713 (2) (572 SE2d 606) (2002).

6. Allen asserts that the trial court erred in sentencing him as a recidivist. The charges of possession of a firearm by a convicted felon were bifurcated from the trial on the actual robberies. During this

second portion of the trial, the state introduced without objection, a certified copy of Allen's prior conviction for robbery, in support of the possession charges. The jury then returned a guilty verdict on all 14 counts of possession of a firearm by a convicted felon.

During the sentencing hearing, the state announced that it would be retendering for purposes of sentencing the certified copy of the same prior conviction. Allen's trial counsel raised no objection. The trial court, in reliance upon that prior conviction, sentenced Allen as a recidivist to the maximum sentences in each case, which he contends was error.

"Where the State proves a defendant's prior felony convictions for the purpose of convicting him of being a convicted felon in possession of a firearm, it may not also use those prior convictions in aggravation of punishment." (Citation omitted.) *Caver v. State*, 215 Ga. App. 711, 713 (4) (452 SE2d 515) (1994). And this Court has previously determined that the legislature did not intend that the allegation and evidence of a prior felony necessary for a conviction of possession of a firearm by a convicted felon could also be used to punish the defendant as a repeat offender under OCGA § 17-10-7. *King v. State*, 169 Ga. App. 444, 445 (313 SE2d 144) (1984). Thus, the state must elect whether it intends to use such evidence to support a conviction for possession of a firearm by a convicted felon or for recidivist sentencing. See *Caver v. State*, 215 Ga. App. at 713 (4); *State v. Freeman*, 198 Ga. App. 553, 555-556 (2) (402 SE2d 529) (1991).

It is undisputed that the trial court relied upon the same prior conviction to support Allen's recidivist sentencing as the state had used in support of his convictions on the 14 possession counts. The trial court clearly indicated that it was sentencing Allen as a recidivist in reliance upon the same evidence. Thus, even though the sentences fell within the permissible range of punishment for the crimes charged, the record in this case is sufficient to overcome the presumption that the sentence was correctly imposed. Compare *Cowan v. State*, 243 Ga. App. 388, 395-396 (8) (531 SE2d 785) (2000); *State v. Freeman*, 198 Ga. App. at 556-557 (3).

Because the state used up its evidence of the prior conviction to support the 14 convictions for possession of a firearm by a convicted felon, there was no remaining evidence to support a mandatory sentence under OCGA § 17-10-7. We do not find that Allen's trial counsel's failure to object prevents us from considering this issue. Without the requisite prior felony, the trial court imposed a mandatory sentence not authorized by the law, and thus this case must be remanded for resentencing. See *Headspeth v. State*, 266 Ga. App. 414, 415 (c) (597 SE2d 503) (2004).

7. We find no merit to Allen's final enumeration of error that he received ineffective assistance of counsel at trial.

In order to establish ineffectiveness of trial counsel, appellant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. . . . In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo.

(Citations and punctuation omitted.) *Williams v. State*, 277 Ga. 853, 857 (6) (596 SE2d 597) (2004).

Allen takes issue with his trial attorney's failure to challenge the search warrant executed at the address he listed on the car rental agreement. But as the trial attorney testified at the motion for new trial, he reviewed the affidavits and determined that Flossie Mae White was the lessor of the residence, not Allen. White had given consent to search her car and did not object to the search of her home. Under these circumstances, Allen's trial counsel felt that he did not have standing or sufficient ground to challenge the search. "The fact that appellant and his present counsel now disagree with the difficult decisions regarding trial tactics and strategy made by trial counsel does not require a finding that appellant received . . . ineffective assistance of counsel." (Citation and punctuation omitted.) *Boyd v. State*, 275 Ga. 772, 776 (3) (573 SE2d 52) (2002). Moreover, we find that Allen has failed to demonstrate that such a motion would have been successful, and thus had failed to show that his trial counsel's failure to file such a motion prejudiced the result in his trial.

The second ground Allen raises in support of his claim of ineffective assistance of counsel is his trial attorney's failure to object to the introduction of his prior felony conviction for the purpose of recidivist sentencing. But that argument is moot, given our holding in Division 6, above, that the case must be remanded for resentencing without reference to recidivist punishment.

*Judgment affirmed and sentence vacated and remanded. Ruffin, P. J., and Eldridge, J., concur.*

DECIDED JULY 15, 2004 — ▮

*Jackson & Schiavone, Steven L. Sparger*, for appellant.

*Spencer Lawton, Jr., District Attorney, Christine S. Barker, Assistant District Attorney*, for appellee.